NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-1134

STATE OF LOUISIANA

VERSUS

NICHOLAS COURVILLE

* * * * * * * * * *

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 04K5594D
HONORABLE DONALD WAYNE HEBERT, DISTRICT JUDGE

* * * * * * * * * *

ELIZABETH A. PICKETT
JUDGE

* * * * * * * * * *

Court composed of Oswald A. Decuir, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

AFFIRMED.

Earl B. Taylor
27th JDC District Attorney
Jennifer Ardoin
Assistant District Attorney
P. O. Drawer 1968
Opelousas, LA 70571-1149
(337) 948-3041
Counsel for Plaintiff/Appellee:
State of Louisiana

**Peggy J. Sullivan**
**Louisiana Appellate Project**
**P. O. Box 2806**
**Monroe, LA 71207**
**(318) 388-4205**
**Counsel for Defendant/Appellant:**
**Nicholas Courville**


**Nicholas Courville**
**In Proper Person**
**Winn CC Dogwood Unite C-2**
**P. O. Box 1260**
**Winnfield, LA 71483-1260**

**PICKETT, Judge.**

## STATEMENT OF FACTS

In the early morning hours of December 26, 2004, two intruders entered the home of Kenneth Neely in Krotz Springs. One of the intruders fought with Mr. Neely, and one took approximately $600 from the home. Following an investigation by the St. Landry Sheriff's Office, Nicholas Courville was charged with one count of armed robbery, in violation of La.R.S. 14:65, and one count of aggravated burglary, in violation of La.R.S. 14:60. He was tried by a jury on December 17, 2008.

Lindsey Landry was the first witness to testify for the state at trial. Before testifying, she acknowledged she had been granted immunity from prosecution and acknowledged that if she lied, she could be prosecuted for perjury. Ms. Landry testified that she moved in with her mother a month or two before Christmas 2004. Prior to that, she had lived with Kenneth Neely in Krotz Springs for two or three years where she and Mr. Neely shared his mobile home, which was situated on its own lot. Mr. Neely visited Ms. Landry at her mother's home on Christmas Day. After the celebration, Ms. Landry returned with Mr. Neely to his home.

Ms. Landry explained she and Mr. Neely had been separated for a month or two, but they attempted to reestablish her living arrangements with him that Christmas evening. After they prepared for bed, their dog needed to go outside. Ms. Landry testified that after letting the dog outside, she locked the door and waited inside for the dog to return. The dog barked as usual when it was ready to come inside. As Ms. Landry let the dog inside, two men rushed into the home. Ms. Landry

1

testified she primarily saw one man in a ski mask because the second man wore a hoodie and she could not see his face.

At some point, Ms. Landry noticed that the man in the ski mask wore braces and had long dirty blonde hair that curled out and realized the ski-masked man was Derek Evans. He wore gloves and had a knife in his hand; he held the knife to her throat. He took her first to the couch, then to the bedroom, and, lastly, to the kitchen. At the couch, he sat next to her and continued to hold the knife to her throat; the man in the hoodie was fighting with Mr. Neely.

Ms. Landry testified she later learned that the man wearing the hoodie was the defendant Nicholas Courville. She related that the defendant also entered Mr. Neely's home with a knife. According to Ms. Landry, the defendant struggled with Mr. Neely, and during the struggle, he ended up on top of Mr. Neely and began choking him.

Ms. Landry stated Mr. Evans demanded, "Give me the money. Where is the money at?" She testified she did not know whether there was money in the home because she had not been living there. Ms. Landry stated that, once in the bedroom, Mr. Evans searched the dresser drawers and found money in the bottom drawer. She did not know the amount of the money he found. She further stated she did not see any drugs in the home that evening and did not witness a fight or disagreement over drugs, the price of drugs, or the amount of drugs.

Ms. Landry said the struggle between the defendant and Mr. Neely resulted in a cut on the back of Mr. Neely's head. The cut was deep, and she could see the bone when she examined it. Ms. Landry related that, during the altercation, the defendant

2

threw a chair at Mr. Neely. The men fell onto the chair during the struggle, and it broke. The fight also resulted in broken glass. When the two men fled, the defendant left his knife on the floor.

Ms. Landry explained that the defendant took her into the bathroom where he looked in the mirror and adjusted his hood. A cross pendant fell onto the floor as he did so. The cross, found on the bathroom floor by investigating officers, belonged to neither Ms. Landry nor Mr. Neely. Ms. Landry was certain the man she saw in the bathroom mirror was the defendant. She was also certain the person in the ski mask was Mr. Evans. Ms. Landry said the two men called each other by name during the offense. While she was in the bedroom with Mr. Evans, the defendant shouted, "Hurry up, Derek. Let's go." Mr. Evans responded, "Hold on, Nick." At that moment, Ms. Landry realized who *both* men were.

According to Ms. Landry, Mr. Evans had previously been to the home one time while she was present, and the defendant had been at the home approximately two times when she was present. One of the defendant's visits occurred when Mr. Evans had also been there. Ms. Landry testified there was no possibility that the defendant left the knife on a previous visit. She testified it was not on the floor when she let the dog outside.

Ms. Landry recalled that, after taking the money from the dresser, Mr. Evans brought her back into the kitchen. The defendant said, "Let's switch," and they switched up. Mr. Evans restrained Mr. Neely while the defendant told Ms. Landry, "Let's go into the bathroom." The defendant no longer had his knife at that point. Ms. Landry was frightened. Once in the bathroom, the defendant told her to get into

3

the shower. There was a mirror over the vanity in the bathroom. She saw the defendant's face in a set of mirrors in the bathroom, which were set at angles that reflected the defendant's image in the vanity mirror when he adjusted his hoodie. Ms. Landry testified she was positive that the person in the mirror was the defendant; she repeated that there were no drugs in the home that evening.

On cross-examination, Ms. Landry stated that Mr. Evans' previous visit was for the purpose of purchasing cocaine; however, on the night of the incident, he was not there to purchase cocaine. She maintained that there were no drugs in the home on the night of the offense. Ms. Landry further stated that Mr. Neely's cellular telephone was on the counter when she let the dog out and that it never rang. Ms. Landry said the defendant did not take anything from Mr. Neely. She testified the defendant dropped his knife when he struggled with Mr. Neely.

On redirect examination, Ms. Landry stated the defendant told Mr. Evans to get the money. It was then that Mr. Evans demanded money from her. Ms. Landry recalled responding that she did not know where there was any money. When Mr. Evans took Ms. Landry into the bedroom, he first looked under the bed and under the dresser before he began rifling through the dresser drawers. Ms. Landry did not remember Mr. Neely taking any telephone calls about drug transactions that evening.

Mr. Neely also testified at trial. He acknowledged that pursuant to a Motion to Compel filed by the state, he had no right to invoke his Fifth Amendment privilege against self-incrimination, but any incriminating information derived from his testimony would not be used against him. At the time of trial, Mr. Neely was thirty-one years old. He stated he had been working since he was seventeen. In 2004, he

4

worked as a combination welder, and he was so employed at the time of trial.  Mr. Neely asserted he had never been arrested for, charged with, or convicted of a crime.

Mr. Neely said he did not know the defendant before 2004.  He had seen him approximately four or five times prior to the early morning hours of December 26, 2004.  According to Mr. Neely, the defendant had been to his home two or three times, and they had gone deer hunting together.  Mr. Neely stated the defendant did not leave a knife at his home during one of those visits.

Mr. Neely explained he was related to Mr. Evans.  He testified Mr. Evans had visited his home on one prior occasion when he accompanied a couple of his friends there.  Mr. Neely stated the only time Mr. Evans had been to his home with the defendant was the night of the incident.

Mr. Neely testified he spent Christmas Day visiting family and friends then went to Ms. Landry's parents' home.  Ms. Landry agreed to try and work things out between them and accompanied him back to his home.  Mr. Neely recalled he and Ms. Landry arrived at his home around eleven o'clock that evening, and they prepared for bed.  Ms. Landry had brought her dog with her, and she let the dog outside.  Mr. Neely was in the kitchen at the time.  After letting the dog out, Ms. Landry closed and locked the door as was her custom.  The dog barked to be let back inside about fifteen minutes later.  When Ms. Landry opened the door, two people were there.  One was wearing a ski mask and the other was wearing a hoodie.  Mr. Neely said he was not sure what the person in the ski mask did when he entered because the person wearing the hoodie had a knife and charged him.  Mr. Neely was surprised and tried to defend himself.

5

Mr. Neely maintained he had consumed neither alcohol nor drugs that day. Although he admitted he had sold drugs from his home in the past, he stated he did not have any drugs in his home that evening. He did not realize where the person in the mask was or what he was doing because he was fighting with the person in the hoodie. Mr. Neely said he was cut on the back of his head, but the fight remained basically fistic. He testified he was not aware of what happened to the knife; he was trying not to get cut or killed. The defendant threw a chair at him; it broke. A glass dish on the table was also broken during the struggle.

Mr. Neely testified the person in the hoodie eventually subdued him, then knelt on his arms and choked him with a hand around his throat. Mr. Neely could not breathe. Mr. Neely recalled that the person in the hoodie told the ski-masked person to "Go get the money." According to Mr. Neely, the person in the hoodie told the ski-masked person, "Hurry up, Derek," and the ski-masked person replied, "Hold up, Nick." When he heard the person in the hoodie's voice, he recognized him as the defendant. Mr. Neely further testified that at some point, the defendant called Mr. Evans over and instructed, "Hold him down." At that time, Mr. Evans held Mr. Neely at knife point while the defendant took Ms. Landry into the back of the home.

Mr. Neely explained he had approximately $600.00 in his drawer from cashing a per diem check. He denied conducting any drug transactions that evening and stated he had not promised the defendant he would sell him drugs.

On cross-examination, Mr. Neely said his last drug transaction before that evening had occurred a week or so before. He did not recall exactly because the

6

offense had occurred three or four years before trial. Mr. Neely said he did not recognize Mr. Evans as one of the perpetrators until the defendant called his name. He also stated that he did not give the men anything and that they took money from Ms. Landry. He explained, however, that he did not see the money change hands because he was pinned down being choked by the defendant at the time.

Mr. Neely testified that he no longer sold drugs and that he did not have any drugs in his home at the time of the offense. He stated he did not speak to the defendant on the telephone Christmas Day but explained they had gone hunting together either one or two days earlier. He also stated he had not spoken to Mr. Evans either in person or over the telephone that day.

Mr. Neely said that he told the police he had a cut on his head. After reviewing his statement, he acknowledged he must have forgotten to include that information in his statement. Mr. Neely also acknowledged that he did not specifically mention a "fight" but explained he considered being hit over the head with a chair a fight.

Deputy Jerry Guillot had been working for the St. Landry Sheriff's Office approximately three months when he was called to respond to the incident at 1:29 a.m. on December 26, 2004. He testified that when he entered the home, he noticed blood on the floor, a broken chair, broken glass, a knife, and the wound on Mr. Neely's head. He also saw an item in the bathroom. Deputy Guillot testified that while Mr. Neely and Ms. Landry were upset, neither appeared to be intoxicated. He took statements from both Ms. Landry and Mr. Neely. Deputy Guillot related that Mr. Evans went to the police department before his shift ended at 6:00 a.m.

7

On cross-examination, Deputy Guillot explained that Mr. Neely told him his head injury occurred when he was struck with the wooden chair, not that he had been cut with the knife. On redirect examination, Deputy Guillot related that Ms. Landry's statement included the information that there were two men and that one of the men held her on the couch with a knife while the other fought with Mr. Neely. He further explained Ms. Landry told him that one of the men made her give him the money while the other man held Mr. Neely down and that the one who had been holding down Mr. Neely subsequently took her into the bathroom.

Randy Lorah also testified for the state. He testified that he worked as a detective in criminal investigations from 2002 until 2006 and that he had about fifteen years of experience. He responded to the dispatch reporting the offense at Mr. Neely's home. He took the pictures of the scene and Mr. Neely and interviewed the defendant. According to Mr. Lorah, he informed the defendant of his *Miranda* rights, and the defendant indicated he understood his rights but refused to sign the rights form.

During the interview, Mr. Lorah informed the defendant that they had retrieved a knife and that he was going to send it off for DNA and fingerprint analysis. The defendant then admitted that the knife was his but explained he had left it at Mr. Neely's home when they went hunting a couple of days earlier. Mr. Lorah stated he did not send the knife for analysis because the defendant's identification of the weapon obviated the need for analysis. Mr. Lorah acknowledged that his statement differed from the testimony of both Mr. Neely and Ms. Landry and stated it was a mistake on his part. He also acknowledged his statement differed from that written

8

by Deputy Guillot. Mr. Lorah stated he based his report on the report issued by the officer in charge's statement which was erroneous.

On cross-examination, Mr. Lorah explained he did not issue a supplemental report with corrections because he did not notice the error until the date of trial. He reported the defendant had alleged drugs were involved and being sold out of Mr. Neely's home. Mr. Lorah also reported Mr. Evans stated in his statement that the defendant made him give the defendant all the money except five dollars and the drugs. According to Mr. Lorah, Mr. Evans was initially uncooperative and denied involvement, but he later gave a written statement. Mr. Evans stated that Ms. Landry gave him $550 in cash and that once he returned from the bedroom, the defendant instructed him to hold down Mr. Neely. Mr. Evans did not admit using or purchasing cocaine, and he did not specify where he had obtained the drugs.

On redirect examination, Mr. Lorah explained that Mr. Evans admitted breaking into Mr. Neely's home at the defendant's instigation but claimed the defendant coerced him then took all of the money from the offense. Mr. Lorah also related that Mr. Evans informed him that he and the defendant had donned gloves and masks in preparation for the offense.

Jessica Courville testified for the defendant. She stated that late on December 24 and early on the morning of December 25, 2004, she was home with her father, her grandmother, and her brother, the defendant. According to Ms. Courville, she and the defendant were watching television around 11:00 or 11:30 p.m. when he received a call from Mr. Evans; Mr. Evans then arrived at their home in his mother's Blazer. She stated they all went into her father's room and talked about getting some cocaine.

9

Mr. Evans placed a telephone call, then he and the defendant left. When they returned, they had a bag of cocaine which they weighed on a digital scale. Ms. Courville testified the cocaine was three grams less than the amount the defendant and Mr. Evans said they paid for. The defendant made a phone call and told her and Mr. Evans, "Kenny said he's going to make it right." The defendant and Mr. Evans left. Ms. Courville did not know when they returned because she went to sleep. She recalled seeing the defendant and Mr. Neely together on several occasions; they had gone hunting together several times. That night was the first time she had seen Mr. Evans at their home.

Cecil Brent Courville, the defendant's father, testified for the defendant. He stated that on Christmas Day 2004, his daughter Jessica, and his youngest son, Colin, spent the day at his home and that at around 10:00 p.m., the defendant and Mr. Evans were also at his home. They were all hanging out and watching television. Mr. Courville testified that the defendant and Mr. Evans made a few telephone calls then left. They returned and made more telephone calls then left again. They returned a second time and brought cocaine with them from Mr. Neely's. According to Mr. Courville, the defendant and Mr. Evans left again. Mr. Courville received a call from the defendant around 1:00 a.m. The call originated from a telephone belonging to Mr. Evans' mother. Mr. Courville said the defendant asked him for money and said he needed an extra one hundred dollars to finish the deal. Mr. Courville said he did not give the defendant any money, and the defendant returned.

10

On cross-examination, Mr. Courville said that "they" were not present when the defendant made his telephone calls. He assumed the defendant spoke to Mr. Neely because they had been trying to contact him for an hour or more. The last time the defendant returned, he had drugs. Mr. Courville said he did not see the defendant with drugs when he returned any other time. He said the defendant stated that he had been shorted by Mr. Neely. Mr. Courville stated he did not own a digital scale, but there may have been one in the home.

The defendant then testified in his defense. He related that when he spoke to Mr. Evans on December 25, 2004, it was late and about the time people would be going to bed. He said he was watching television with his brother and sister when Mr. Evans called to see if he could get him some cocaine. The defendant responded that he had been trying to contact Mr. Neely all day, but he had not been successful. Mr. Evans then came to visit him.

The defendant said Mr. Neely eventually answered his telephone and confirmed that he was in possession of cocaine powder. The defendant said he and Mr. Evans went to Mr. Neely's, got the cocaine, and went home. The defendant said he trusted Mr. Neely because he was ordinarily trustworthy about giving him the quality and quantity of cocaine for which he paid, so he did not bring his scale with him. The defendant said he weighed the cocaine when he returned to his father's home because he was going to divide it with Mr. Evans and realized he was shorted. According to the defendant, he contacted Mr. Neely. Mr. Neely told him to return to his home, and he would make up the difference. The defendant said he announced this information while both his sister and father were in the room.

11

The defendant stated he and Mr. Evans returned to Mr. Neely's home and parked at a vacant lot next door. They walked over, and the dog was outside barking. When Ms. Landry opened the door, he was in front of her. Ms. Landry let him inside, and Mr. Neely was sitting in a chair in the kitchen. When he asked Mr. Neely about the shortage, Mr. Neely asked to see the bag. After examining the bag, Mr. Neely said he was not going to give him any more cocaine because the bag showed evidence of tampering. The defendant said he attempted to talk Mr. Neely into correcting the shortage, but Mr. Neely told him to leave. He refused to leave and, instead, became insistent; Mr. Neely shoved him. They then fought and fell onto the chair.

The defendant related that said he was wearing a hood because it was cold outside and that Mr. Neely pulled on his hood. He testified he did not take anything from Mr. Neely and denied knowing anything about Mr. Evans taking any money. He maintained that, to his knowledge, Mr. Evans stayed by the door throughout the visit to Mr. Neely's home. He said he had obtained the money for the drugs through work and through Christmas money given to him by his father.

On cross-examination, the defendant said he had been convicted of both aggravated battery and attempted possession of a firearm by a felon. He stated the extra cash he asked his father to provide was for him and Mr. Evans to go to a bar. He denied that the knife belonged to him and denied telling Mr. Lorah that it was his. He accused Mr. Lorah of putting a mark over his eye that was depicted in a photograph and noted in his report. The defendant also accused Mr. Lorah of including things in his statement that he did not say. The defendant said the fight with Mr. Neely ended when he got up and ran out of the home. He said Mr. Evans

12

ran out at the same time. The defendant theorized that Mr. Evans said he, the defendant, coerced him into robbing Mr. Neely because he was afraid of going to jail. He claimed Mr. Evans was not telling the truth.

On rebuttal, Mr. Lorah denied being present when the injury shown by the defendant's mug shot was inflicted and denied inflicting the injury. Mr. Lorah stated that after he took the defendant to the booking area, he went into his office to type the paperwork. While there, he was informed the defendant had become "very combative" and had to be subdued. When Mr. Lorah went back to see the defendant, he had the mark or bruise. He explained he had examined the defendant's arms, body, and head to make sure he did not have any cuts or lacerations, and there were no marks or bruises on his chest or arms. On cross-examination, Mr. Lorah said he had been fired by the new sheriff for dereliction of duty.

The state next called Mr. Evans to testify as a rebuttal witness. Mr. Evans acknowledged he was charged with burglary and theft in relation to the invasion of Mr. Neely's home. He testified those charges were dismissed in exchange for his testimony against the defendant and that he had been granted immunity and could not be prosecuted for anything he testified about as long as he told the truth.

Mr. Evans stated he had been arrested the night of the incident after he went to the police station in his own vehicle. He was seventeen years of age at that time and was twenty-one years of age at the time of trial. When he was arrested, Mr. Evans denied having invaded Mr. Neely's home but then gave a statement and admitted having done so. He said he was not threatened into giving the statement although the detective taking his statement promised him a lesser charge.

13

Mr. Evans testified that he used drugs at the time of the offense, but he did not think he had a drug problem. He explained that although he had not undergone rehabilitation, he no longer used drugs. At the time of the offense, Mr. Evans said he had known the defendant for a couple of months. Mr. Evans said he had been to Mr. Neely's home a few times before that night and had purchased cocaine from him. He denied contacting the defendant for the purpose of obtaining drugs.

Mr. Evans said that, after speaking to the defendant on the telephone, he drove to the defendant's home; the defendant's sister was present. They tried to contact Mr. Neely but were not successful. He said they never got in touch with Mr. Neely and he and the defendant discussed robbing Mr. Neely. Mr. Evans testified he did not have any money to go halves on a quarter ounce of cocaine. He stated that he usually purchased a gram, just enough to get high, for fifty dollars.

Mr. Evans did not remember why he initially contacted the defendant that evening but thought it may have been about drugs. He related that he and the defendant took turns calling Mr. Neely and that the defendant had a plan to lure Mr. Neely away from his home so they could "go inside and take drugs or whatever" while he was not home. According to Mr. Evans, he and the defendant were at the Courville home when the conversation took place, but neither the defendant's father nor his sister was present for the conversation. Mr. Evans was aware that Mr. Neely had a longtime girlfriend who was sometimes at his home, but they did not plan on her being present and did not discuss the possibility that she would be present.

Mr. Evans explained that, because they were unable to contact Mr. Neely, they decided to just go to the home and take what was there by force. He parked at a boat

14

ramp near Mr. Neely's home. After looking around for a little while, they went to the front of the home when Mr. Neely let the dog outside. The dog started barking at them. Mr. Evans reported that the defendant supplied him with a ski mask and gloves while the defendant wore a hood and gloves. He did not know what happened to the disguise. He denied having a knife and stated he did not see a knife that evening or know the origin of the knife recovered from the scene.

Mr. Evans said he held Mr. Neely down after the defendant finished fighting with him and he did not threaten Ms. Landry. He did not clearly recall the events because they happened too quickly. He believed the chair was broken in the fight when the defendant and Mr. Neely fell over it. The defendant went into the bedroom to find the money while Mr. Evans restrained Mr. Neely, who seemed dazed. Mr. Evans did not remember seeing blood. Mr. Evans related that was his only visit to Mr. Neely's home that evening. He was not familiar with the account of facts given by the defendant and his family.

Mr. Evans said the defendant emerged from Mr. Neely's bedroom with approximately $600. They also took two packages of cocaine, each one-eighth ounce, plus one open bag of cocaine from the kitchen table. After examining his statement, Mr. Evans agreed that, in his statement, he wrote that the defendant instructed him to take Mr. Neely's wife and go get the money. Mr. Evans also wrote that he complied with the defendant's order and came back with the money. Mr. Evans additionally penned that, after the incident, he gave the defendant all of the drugs and the money except five dollars. Mr. Evans averred that the information on the sworn statement was the correct account. He explained that he had become confused during

15

his testimony because he was really nervous. He said that although he was nervous the night of the offense, he would have remembered having a knife and maintained that he did not have a knife on the night in question. Mr. Evans restated that he did not see the defendant with a knife, but he agreed they stole approximately $600 and some drugs.

Mr. Evans asserted he participated in the offense because the defendant threatened his life. Mr. Evans owed the defendant $50 and testified the defendant told him that he knew where he lived and "would get the money back somehow, some way." Mr. Evans said the other information in his statement was exaggerated, but, at the time, he believed the defendant was going to kill his family, too. Since then, the defendant contacted Mr. Evans and asked him to change his story to say that they went to Mr. Neely's for a drug deal instead of a robbery. Mr. Evans said he let the defendant know he would be telling the truth at trial, which is that they did not go to Mr. Neely's for a drug deal or to get drugs to make up for a shortage in their purchase.

On cross-examination, Mr. Evans said he excluded a lot of information from his first statement to the police. The detective tore up Mr. Evans' initial statement; Mr. Evans said he supposed this was because the detective wanted the truth and felt Mr. Evans was lying. Mr. Evans' statement that said the defendant told him he would kill Mr. Evans' parents was true. Mr. Evans acknowledged he was immune from prosecution. He said he located the money underneath the dresser in the bedroom, stating Ms. Landry reached under the dresser and pulled out wads of money when he asked her to identify the location of the money.

16

On redirect examination, Mr. Evans said Ms. Landry appeared to be "very" frightened at the time she gave him the money. Mr. Evans denied "making her" give him the money. Mr. Evans asked, "Where's the money? Where's the money." He did not recall going through the dresser drawers, but it was possible he did so. He was still wearing the ski mask and gloves at the time. When they went back into the living room, the defendant was still holding down Mr. Neely. The defendant told him to swap places, and he complied. The defendant went looking "for more because he didn't think that that [sic] was all." Mr. Evans said he did not remember a lot of things about the event; his adrenaline was rushing because he was scared.

At the conclusion of the trial, the jury found the defendant guilty as charged. The defense filed a motion seeking a post-verdict judgment of acquittal. After a hearing, the trial court denied the motion and imposed the following sentence: five years at hard labor for the simple robbery conviction and twenty-five years at hard labor for the aggravated burglary conviction. The trial court designated that the sentences were to run concurrently with each other but consecutively to any other sentences the defendant was serving at the time or would serve in the future. The defendant then filed a motion to reconsider sentence seeking concurrent sentences and any other relief, which the trial court denied. He now appeals his convictions and sentences.

## ASSIGNMENTS OF ERROR

1. The evidence adduced at trial was insufficient to support convictions of aggravated burglary and simple robbery.
2. The sentences imposed are excessive under the facts and circumstances of this case.

17

3.      The jury erred in finding the defendant guilty when the evidence was not sufficient to support his convictions [and] where the evidence presented by the state at trial did not satisfy the elements of the crimes as required by law.

4.      The court erred in allowing the use of perjured testimony.

## SUFFICIENCY OF THE EVIDENCE

Defense counsel and the defendant, *pro se*, assert the evidence presented at trial was insufficient to support his convictions of aggravated burglary and simple robbery and urge that the jury should have believed the defense witnesses because they were more credible than the state's witnesses. The defendant, *pro se*, urges the State failed to prove that he robbed the victim named in the bill of information, Kenneth Neely. In the alternative, the defendant asserts that his co-defendant's decision to take money from Ms. Landry should not be imputed to him. The defendant adds that the State failed to prove aggravated burglary because it did not prove he entered the home without permission with the intent to commit a felony or theft therein.

The Louisiana Supreme Court discussed the standard of review for evaluating the sufficiency of the evidence on appeal in *State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted), stating:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the fact finding function of the jury only to the extent necessary to assure the *Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

18

The defendant primarily complains that the evidence was insufficient to convict him because the jury should not have believed the state's witnesses. Appellate courts cannot, however, reassess the credibility of witnesses or re-weigh evidence:

> [The supreme court has] repeatedly cautioned that [the] due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law."

*State v. Calloway*, 07-2306, p. 10 (La. 1/21/09), 1 So.3d 417, 422 (citations omitted). "The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness[.]" *State v. Higgins*, 03-1980, p. 17 (La. 4/1/05), 898 So.2d 1219, 1232, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005). "Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence." *State v. Marshall*, 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369, *cert. denied*, 552 U.S. 905, 128 S.Ct. 239 (2007).

Our extensive review of the facts and evidence presented shows that the testimonies of Mr. Neely, Ms. Landry, and Mr. Evans support each other to a large extent, notwithstanding that Mr. Evans denied having a knife or knowing that the defendant had one and both Ms. Landry and Mr. Neely denied having drugs in the home. All three testified that they received immunity from prosecution for any charges related to the incident in exchange for their truthful testimony at the defendant's trial. Thus, the jury had the opportunity to evaluate the immunity deals and any discrepancies between the testimonies of these witnesses and their prior

19

statements in determining the credibility of these witnesses. The omissions of facts can be attributed to the self-interest of each of witness, and many of the discrepancies between their earlier statements and their testimonies can be attributed to either the lapse of time or nervousness. Overall, the accounts of events given by the state's witnesses are very similar. Therefore, the jury's credibility determination was not clearly contrary to the evidence.

## SIMPLE ROBBERY

The defendant contends the evidence does not support his simple robbery conviction. "Simple robbery is the taking of anything of value belonging to another . . . that is in the immediate control of another, by use of force or intimidation, but not armed with a dangerous weapon." La.R.S. 14:65(A).

The evidence, when viewed in a light most favorable to the prosecution, shows that the defendant and Mr. Evans, working in concert, struggled with Mr. Neely in his home. They then took turns forcibly restraining Mr. Neely while they took approximately $600 from his bedroom. The money was taken from Ms. Landry's immediate presence when she was forced into the bedroom by Mr. Evans, who she testified was armed with a knife, while Mr. Neely was being restrained by the defendant. Mr. Evans further testified that they took two bags of cocaine and an open bag of cocaine from the kitchen table.

"All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the

20

crime, are principals." La.R.S. 14:24. Principals are considered parties to those crimes. La.R.S. 14:23.

> [A] defendant's mere presence at the scene is not enough to "concern" him in the crime. Only those persons who knowingly participate in the planning or execution of a crime may be said to be "concerned" in its commission, thus making them liable as principals. A principal may be connected only to those crimes for which he has the requisite mental state. *State v. Neal*, 00-0674 (La.6/29/01), 796 So.2d 649, 659, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).

*State ex rel. D.F.*, 08-182 pp. 5-6 (La.App. 1 Cir. 6/6/08), 991 So.2d 1082, 1085, *writ denied*, 08-1540 (La. 3/27/09), 5 So.3d 138. "[T]he defendant need not actually take anything to be found guilty of [robbery] . . . . A person who aids and abets another in a crime, is liable just as the person who directly commits it, although he may be convicted of a higher or lower degree of the crime. . . ." *State v. Cayton*, 98-100, p. 2 (La.App. 3 Cir. 10/28/98), 721 So.2d 542, 543 (citations omitted).

An item is within the immediate control of a person if it is in the same room with them. In *State v. Johnson*, 97-317 (La.App. 4 Cir. 8/19/98), 718 So.2d 553, the defendant was convicted of simple robbery after ordering a community center worker into a back room, taking money from a drawer in that room, and then fleeing with the cash. The fourth circuit found sufficient evidence to support the conviction.

When the evidence is viewed in the light most favorable to the prosecution, it shows that the defendant and Mr. Evans took something of value belonging to another that was in the immediate control of another by use of force or intimidation. Thus, any rational trier of fact could have found the essential elements of the simple robbery proven beyond a reasonable doubt. Accordingly, the defendant's argument is without merit.

21

## AGGRAVATED BURGLARY

The defendant also urges the evidence is not sufficient to support his aggravated burglary conviction. "Aggravated burglary is the unauthorized entering of any inhabited dwelling . . . where a person is present, with the intent to commit a felony or any theft therein, if the offender, (1) Is armed with a dangerous weapon; or . . . (3) Commits a battery upon any person while in such place." La.R.S. 14:60. "Battery is the intentional use of force or violence upon the person of another." La.R.S. 14:33.

The evidence, when viewed in a light most favorable to the prosecution, shows the defendant planned to steal money and drugs from the mobile home inhabited by Mr. Neely. In order to facilitate the taking of those items, the defendant armed himself with a knife and entered Mr. Neely's home without permission while both Mr. Neely and Ms. Landry were present. The defendant then immediately attacked Mr. Neely and struggled with him, causing injuries to Mr. Neely's face and head. Thus, when the evidence is viewed in the light most favorable to the prosecution, it was sufficient to support the defendant's aggravated burglary conviction. This assignment of error is without merit.

## EXCESSIVE SENTENCE

In his second assignment of error, the defendant argues the sentences imposed are excessive under the facts of this case. He contends the trial court set forth no aggravating or mitigating factors other than his criminal history and complains his sentences were not tailored to him as the offender or the offenses because the trial court failed to both discuss and address his family life, his work history, and his drug

addiction. He concludes that the penalties imposed do not serve the ends of justice and should be set aside as excessive.

At the defendant's sentencing, the state introduced the presentence investigation report into evidence, and the trial court took judicial notice of the entire record. The trial court then imposed the defendant's sentences and stated oral reasons therefor:

> THE COURT: Alright. Court is going to consider the sentencing statutes of both statutes, the aggravating and mitigating circumstances of Article 894.1 and in particular . . . this case, Article 894.1 (A) (1)[undue risk that the defendant will commit another crime], (2)[need of correctional treatment or a custodial environment], and (3)[a lesser sentence would deprecate the seriousness of the crime]. I'm going to consider the sentencing objectives of public protection, rehabilitation[,] and deterrence. I'm going to further consider the record of this individual, which indicates that these two offenses result in him becoming a third time felon. Court notes for the record that the gentleman entered a plea of guilty to an original charge of attempted second degree murder on May 24, 2000[,] and pled guilty to aggravated battery on January 17, 2001, was sentenced to four years hard labor. In addition, on 10/10/04[,] he was charged with possession of a firearm by a convicted felon, entered a plea of guilty to attempted possession of a firearm by a convicted felon, sentenced to three years at hard labor. Two arrests in between those two time periods and then since that time period, which the Court is allowed to take into consideration, the arrests that have occurred since the time of these instant offenses. I'll note in 2005, February, he was arrested for armed robbery and false impersonation. That was dismissed. On July 6, 2005[,] he was arrested for possession of a firearm by a convicted felon. That was dismissed. October 2005 arrested for aggravated second degree battery. That was dismissed. August 28, 2006, charged with second degree battery, simple criminal damage to property. Due to the lack of bill of information being filed[,] a 701 Motion was granted. December 14, 2006, charged with introducing contraband into a penal facility, dismissed. July 30, 2007, charged with distribution of CDS II, cocaine, he's been arraigned, no bill of information [has] been filed at this point in time. November 5, 2007, charged with resisting an officer, battery of an officer, criminal damage to property, pled guilty to resisting an officer and battery of a police officer. On November 7, 2007, charged with unauthorized entry of an inhabited dwelling, entering on and remaining on places after being forbidden, pled guilty to entering or remaining. January 11, 2008,

23

unauthorized entry of a critical infrastructure and felony theft. Matter has been set for arraignment; no bill of information has been filed to date. April 23, 2008, charged with possession of cocaine, drug paraphernalia. Arraigned on both of those, no specific court date has been set . . . yet. April 28, 2008, charged with attempted first degree murder, aggravated second degree battery, aggravated burglary. A bill of information was filed charging attempted first degree murder, armed robbery, aggravated burglary of a dwelling, possession of cocaine, aggravated second degree battery with a dangerous weapon. Matters are set, or were set for June of '09, jury selection as well. I don't have a result as yet. And then in September of '08 charged with aggravated arson and has been arraigned. To say that this gentleman has a storied history would be to me to be putting it lightly. I find him to be a menace to society in general, this community in particular. As a result, after careful consideration of the crimes charged, his long and storied career, I sentence him to serve twenty-five years at hard labor --

. . . .

THE COURT: On the aggravated burglary.

. . . .

THE COURT: I further sentence him to serve five years on the simple robbery, same to run concurrent[ly] with one another, but with no other crime. So[,] on any other time that he gets, it's my intent that these two sentences are to run consecutive[ly] to any other time he may be serving or to be served in the future. I find that these are crimes of violence, that the penalties have not been enhanced.

On August 24, 2009, the defendant filed a "Motion to Amend, Modify and/or Reconsider Sentence." The motion did not allege any error in the trial court's sentences; it simply requested that the trial court consider imposing concurrent sentences and any other relief the trial court was inclined to grant.

The trial court conducted a hearing on the defendant's motion on May 27, 2010. At the hearing, the defense asserted that the sentence should be reconsidered because of inconsistencies between the accounts given at trial by the state's witnesses. The defendant denied having a weapon or taking anything during the

24

incident and alleged he was not the primary perpetrator in the case, pointing out that Mr. Evans was not charged for his part in the incident. The defense asked the trial court to consider the defendant's relative youthfulness at the time of the offense, twenty-four years old, and his consistent drug use as mitigating factors. The defendant stated he thought he could be a good person when sober and clean.

The trial court refused to reconsider the defendant's sentences and gave reasons for its decision:

> When I do initial sentencing, I take a great deal of time and effort. It's much more arduous tha[n] one might think. I am very aware of the situation involved here as in every situation. It's never easy under any circumstance. Despite what people may think, it's easy to sit here when you're running for office and when you -- I'm a law and order judge – that's not necessarily the case. When you begin to consider that you are housing people, removing them from society, I'm telling you that I take that as a very serious responsibility. I do so with the utmost reluctance. I understand that he believes that there are flaws in the transcript. I'm well aware that this was a jury trial. The flaws that he makes reference to in the transcript – the transcript is absolutely accurate, one hundred percent. Now the flaw he makes reference to is what he perceived the jury should or should not have seen. They jury found him guilty. Subsequent to finding him guilty, I looked at his record. It was deplorable. Youth aside, this gentleman treated society with absolute disdain. I believe I said at the time of sentencing with the time that I gave him, that he was a menace to society. I meant that. I mean it today. I looked at the transcript. I looked at the argument. I've had a lot of time to look at this. This matter has been continued several times. I'm going to tell you each time one of these is given I do go back and I read it. I carefully consider it, which is why I decline to wait. The original sentence given was done after a great deal of thought, after considering, as indicated, the aggravating and mitigating circumstances of Article 894.1, the crime itself, the record of this individual. And as a result, I see no reason to change the sentence that was originally rendered, and so I deny – I've allowed you[,] and I've reconsidered the sentence[,] but I decline to change my original sentence.

The defense did not contest the sufficiency of the trial court's reasons for imposing the defendant's sentence in its motion to reconsider sentence or at the

motion to reconsider sentence hearing. Therefore, those arguments are precluded from review on appeal, La.Code Crim.P. arts. 841 and 881.1(E), and our review of the defendant's sentences is limited to bare excessiveness. *See State v. Granger*, 08-1477 (La.App. 3 Cir. 6/3/09), 11 So.3d 649.

This court has previously discussed the standard for reviewing excessive sentence claims:

> [Louisiana Constitution Article] I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331 (citations omitted).

"Whoever commits the crime of simple robbery shall be fined not more than three thousand dollars, imprisoned with or without hard labor for not more than seven years, or both." La.R.S. 14:65(B). Therefore, the defendant's five-year penalty for simple robbery fits within the sentencing parameters set forth by statute. It constitutes an upper mid-range penalty.

"Whoever commits the crime of aggravated burglary shall be imprisoned at hard labor for not less than one nor more than thirty years." La.R.S. 14:60. Thus, the defendant's twenty-five year sentence for aggravated burglary also fits within the

26

parameters set forth by statute. It is a high-range sentence, as it is five-sixths the maximum possible penalty.

Even though a penalty falls within the statutory sentencing range, it may still be unconstitutionally excessive:

> In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case."

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061 (citations omitted). "[T]he trial judge need not articulate every aggravating and mitigating circumstance outlined in art. 894.1[;] the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d 688, 698 (La.1983).

In *State v. Johnson*, 471 So.2d 1041 (La.App. 1 Cir. 1985), the defendant, as in the instant case, was originally charged with armed robbery but convicted of simple robbery. The defendant appealed his seven-year sentence as constitutionally excessive. Noting the district court's reasons for ruling, the first circuit found no abuse of the sentencing court's discretion:

> In imposing sentence, the trial judge noted that the defendant had an extensive previous criminal record, and that the defendant was in need of correctional treatment in a custodial environment. The trial judge stated that the defendant previously had the benefit of supervised parole which had been revoked for parole violation. Thus, it was the

opinion of the trial judge that there was an undue risk that during any period of suspended sentence or probation, the defendant would commit another crime.

*Id.* at 1042 (footnote omitted).

In *State v. Williams*, 452 So.2d 234 (La.App. 1 Cir. 1984), the defendant also received a seven-year sentence after being convicted of simple robbery. The defendant, two women, and another man approached the victim. One of the women struck the victim on the head and knocked him to the ground. Then, the defendant and the two women held the victim down while the second man removed the victim's wallet and keys. All four perpetrators left the scene in the victim's automobile. On appeal, the defendant asserted his sentence was excessive. In reaching its decision, the first circuit noted the violent manner of the robbery, the defendant's three prior misdemeanors and two prior felony convictions, and the sentencing range that would have been applicable if the defendant had been charged as a multiple felony offender. Based upon those considerations, the first circuit found no abuse of the trial court's sentencing discretion.

Based upon (1) the facts of this case; (2) the defendant's extensive criminal history; and (3) the trial court's findings that the defendant constitutes a threat to the community, that there is an undue threat of a repeat offense, that the defendant was in need of correctional treatment, and that a lesser sentence would deprecate the seriousness of the offenses, we find the defendant's five-year sentence for simple robbery does not constitute an abuse of discretion.

In *State v. Coleman*, 450 So.2d 1063 (La.App. 1 Cir.), *writ denied*, 456 So.2d 172 (La.1984), the defendant was also found guilty of aggravated burglary and

sentenced to twenty-five years at hard labor. In *Coleman*, two sisters were home watching television when they heard a noise. They called a nearby male friend who came over and checked the home. While he was there, the friend walked one of the sisters through the home. As they passed a bedroom, they saw the defendant standing with a knife in a lit bedroom. The defendant fled through the bedroom window, which had been pried open and broken. On appeal, the defendant argued his sentence was excessive. The district court had noted that this was the defendant's second conviction as the defendant had previously pled guilty to receiving stolen things; however, the defendant was classified as a first offender for the purposes of the aggravated burglary because the other offense occurred after the burglary. The sentencing court further noted the defendant's juvenile and adult record included numerous charges for dangerous and violent crimes. Based on the district court's reasons for sentencing and the defendant's lengthy criminal history, the first circuit found no abused of discretion.

In the instant case, this was the defendant's third felony conviction, and his two prior convictions were crimes of violence. The defendant has also been charged with many other crimes even after the commission of the instant aggravated burglary. Therefore, based upon (1) the facts of the case; (2) the defendant's extensive criminal history; and (3) the sentencing court's findings that the defendant constitutes a threat to the community, that there is an undue threat of a repeat offense, that the defendant was in need of correctional treatment, and that a lesser sentence would deprecate the seriousness of the offenses, we find the defendant's sentence of twenty-five years at

hard labor for aggravated burglary does not constitute an abuse of discretion. Accordingly, this assignment of error is without merit.

## PERJURED TESTIMONY

The defendant, *pro se*, urges, "The court erred in allowing the use of perjured testimony." He asserts the testimonies of Mr. Evans and Ms. Landry are not credible because they were given in exchange for immunity. He also urges there is evidence in the record that Mr. Neely committed perjury. The defendant points out that Mr. Neely attributed discrepancies in his testimony to the lapse of time between the offense and the trial. The defendant also contends the prosecution elicited perjured testimony in reference to Mr. Evans' statements that he went along with the defendant's plan because he was afraid of the defendant. The defendant alleges the prosecution manufactured Mr. Evans' testimony. He further alleges that there were significant differences between Ms. Landry's trial testimony and her pretrial statements. He complains the defense was not allowed to fully explore the contradictory pretrial statements given by the state's witnesses.

The defendant's attack on the credibility of the state's witnesses has already been addressed. As to his allegations that these witnesses committed perjury, the defendant points out inconsistencies and contradictions within and between various witnesses' testimonies, but he does not present any evidence that any witness intentionally lied under oath. The jury had the opportunity to view the witnesses and assess their credibility. It was aware the fact witnesses were granted immunity in exchange for their testimony and was in the best position to weigh the credibility of

30

that testimony. There is no evidence to support the defendant's claim that the witnesses committed purjury. This assignment of error lacks merit.

## CONCLUSION

We find the defendant's assignments of error lack merit. Both the convictions and sentences are affirmed.

**AFFIRMED.**