PER CURIAM.*
I,The state charged defendant, together with her son Demond Calloway, with the illegal possession of stolen things valued at more than $500 in violation of La. R.S. 14:69. A six-person jury acquitted De-mond but found defendant guilty as charged. The trial court subsequently denied her motion for a post verdict judgment of acquittal and sentenced her to *418 three years imprisonment at hard labor. On appeal, a divided panel in the First Circuit reversed her conviction and sentence on grounds that the evidence at trial failed to support the jury’s finding that she had received the property in question, two relatively new vehicles, with guilty knowledge that they had been stolen. State v. Calloway, 07-0012 (La.App. 1st Cir.11/7/07), 978 So.2d 374 (Pettigrew, J., dissenting). This Court granted the instant application to reverse the decision below because we agreed with the state and with the dissenting views of Judge Pettigrew that the majority on the panel erred by substituting their appreciation of the evidence and credibility of witnesses 12for that of the fact finder and thereby overturned the verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury.
Defendant’s acquisition of the two vehicles in question took place against the background of chaos and tumult following Hurricane Katrina in August 2005. At the time, defendant lived with Travis Williams, her son Demond, and other family members in Marrero, Louisiana. After the storm passed, the family became alarmed at the pervasive sense of destruction and lawlessness and attempted to reach what they considered a safe haven in the Super-dome across the river in downtown New Orleans. However, even after spending a night out in the open, they got no farther than the crest of the Crescent City Connection bridge before retreating home to find the front door kicked in and the residence looted, with all of the remaining food and water gone. As the doors and windows had been broken, the adults took turns at night keeping watch over the children. At trial, defendant and Travis Williams recounted for jurors hearing gunshots and screams during the night. Rumors spread through the neighborhood that the nearby Harvey Canal would soon overflow its banks or even break through its levee.
At some point shortly after returning home, defendant learned from a neighbor that two men were selling cars nearby. Defendant and her son Demond walked to an area at the back of the neighborhood where the man known only to her as “Reggie,” or by his street name, “Eyes,” was selling cars out of a home in the neighborhood. Defendant had learned from her neighbors that Reggie often had cars for sale, and on this occasion, she found him with five or six vehicles held out for purchase. According to defendant, Reggie initially directed her |aattention to a 2004 Toyota Solara. However, concerned for transporting her family out of the neighborhood and to safety, defendant expressed interest in a 2003 Toyota Tundra truck. Reggie appeared reluctant to sell the truck, and as negotiations continued, defendant was summoned home to attend to her daughter, who was having an asthma attack.
When defendant returned, she offered Reggie $2,200, all the money Travis Williams had withdrawn from the bank immediately before Katrina, for the Tundra pickup. To her surprise, he gave her the keys to both the Tundra and the So-lara in return for the cash. Reggie informed her that he did not have the title and registration to the vehicles for her but would make them available in the future. Defendant testified that she was not concerned about the lack of documentation, including the lack of any sales receipt, because of the overall chaos prevailing at the time. She also testified that she did not believe that the vehicles had been stolen because the ignition locks were intact and Reggie handed her the keys to both vehicles. Defendant and her family then used the vehicles to relocate to the resi *419 dence maintained by her mother in an apartment complex in Houma, Louisiana.
Over the next two months, defendant continued to use the Tundra truck, and her son, who had enrolled in a local high school, used the Toyota Solara to travel back and forth to school and to work after school. They parked the vehicles in front of the apartment complex and took no steps to conceal their origin, such as changing out the license plates. However, at the end of October 2005, the Houma police received a tip that the vehicles were in fact stolen. The police found the vehicles at the location described by their informant, and as they inspected them, defendant and her son came out and discussed the circumstances that had brought [4them to Houma. Detective Jude McElroy testified that defendant appeared “very cooperative” and spoke freely of how she had purchased both vehicles for just over $2,000 for the evacuation from New Orleans. In fact, the detective acknowledged at trial that nothing in the vehicles’ outward appearance suggested that they had been stolen and that his initial check of computer records had failed to reveal any reports concerning either vehicle. However, the vehicles still had them original license plates and a check with their registered owners established that the Solara and Tundra had been brought to the same Toyota dealership on LaPalco Boulevard in Harvey, Louisiana, for various repairs shortly before Katrina and had disappeared from the lot during or after the storm when the dealership was looted.
Both owners testified at trial. According to Dr. Dimetry Cossich, he had purchased the Solara in 2004 for $32,000 and when he brought it back to the dealership in August 2005 to fix a minor window leak, the vehicle was “in great condition,” with only 24,000 miles on it. Dr. Cossich never saw the car again and settled with his insurance company for approximately $27,000. According to Dr. Cossich, when the dealership called him in the middle of September 2005 to inform him the vehicle had been stolen, he had attempted to report the theft to the Jefferson Parish Sheriffs Office. He was informed that “they were not taking stolen car claims at this time.” Kevin Adams had his 2003 extended cab Toyota Tundra towed to the dealership to address power steering problems, but in his opinion, the vehicle was otherwise in excellent shape and had only 40,000 miles on it. Adams had purchased the truck for $30,000 and then added to its value by custom painting it for an additional $4,200. He settled with his insurance company after the storm for $23,000. Like Dr. Cossich, Adams attempted without ^success to report the theft to the Jefferson Parish Sheriffs Office. However, unlike Dr. Cossich, Adams had viewed his car in Houma after the police recovered it and found that its interior had been “pretty messed up,” but that it otherwise appeared in good condition.
In support of its case, the state called Jeff Walters, who worked with a Toyota dealership in Houma, and qualified him as an expert in appraising the value of cars. Walters informed jurors that a 2004 Toyota Solara in good condition would be worth $22,000 to $24,000 at an auction or $27,000 in a private sale. A 2003 Tundra in good condition would bring anywhere from $17,000 to $20,500. On the other hand, Walters acknowledged that power steering problems with the Tundra would reduce its value and that water damage to either vehicle might lower the price down to $5,000, or cause him to lose interest in the vehicle altogether. Walters also conceded that he had personally not viewed either vehicle.
*420 The state did not introduce photographs of the vehicles at trial but jurors acquired some information about their condition after the storm from defendant and members of her family. Travis Williams, who had supplied the cash for the sale, described the condition of both vehicles as “fair.” By his account, the sunroof of the Solara had a cut, the body had been scratched after it was “keyed,” and the side mirror broken off. The vehicle also had wet carpeting on the floorboards as the result of water damage. As for the Tundra, the stereo had been pulled out, leaving wires dangling, one of its tires was flat, and the vehicle had power steering damage. Defendant also testified that the truck’s power steering was damaged, that one of its tires had a slow leak, and that a headlight appeared “dim” but was not altogether out. However, the vehicle had no water damage. As Ufor the Solara, the floorboard was wet, as if the vehicle had been standing in water, the body had been scratched and dented, and its sunroof cut. Defendant’s mother had inspected the vehicles and found that the sunroof of the Solara “had a little cut,” a scrape on the side, and a side mirror broken. The truck was intact but had had its stereo ripped out, exposing the wires.
Defendant and her son steadfastly maintained at trial that they had no idea that either vehicle had been stolen. Defendant testified that she had never purchased a vehicle before and had no idea what the Tundra or Solara sold for, although the family lived, by Demond’s estimate, within two miles of several car dealerships on LaPalco Boulevard. In fact, neither she nor her son had a driver’s license. Thus, defendant testified that the gross disparity in price did not alert her to the dubious origins of the vehicles. Nor did the appearance of the vehicles place her on notice. There were “no wires popped,” defendant testified, “and I had keys.” Defendant attributed the lack of documentation for the sale to the confusion following Katrina and the haste with which Reggie brokered the sale to avoid losing his interest in them altogether if the water in the Harvey Canal continued to rise and the levee broke. She told Reggie to send the bill of sale for the vehicles to her mother’s address in Houma when things calmed down in Marrero. Reggie told her that he would personally bring the paper work to Houma but he never appeared and when defendant went back to New Orleans to look for him, “he was gone.” Defendant acknowledged that she had a prior conviction for receiving stolen things approximately 10 years old but testified that she had been “scared straight since.” As far as Demond was concerned, the vehicles were “a light out of heaven.” He never looked for a title or registration for the Solara 17because, “That was all my momma’s job. She just gave me the keys, and I just drove.”
During closing arguments, the prosecutor urged jurors to consider the “ridiculously low price” defendant paid for the vehicles and that, even conceding the overwhelming necessity of evacuating from New Orleans in the aftermath of the storm, defendant and her son had continued to use the vehicles in the relative safety in Houma for two months before the police received the tip that led to their arrests. “That’s where the problem lies,” he argued to jurors, “they continue to use them, stolen cars for two months without turning the cars in to any authorities.” In denying defendant’s motion for a post verdict judgment of acquittal, the trial court subscribed to the same view. “I believe that the real crime that was committed,” the trial judge observed, “was the failure to turn these vehicles in once they were out of harm’s way and once they were at safety.”
*421 However, for the majority on the First Circuit panel, defendant’s testimony that she had no idea the vehicles had been stolen from the dealership was not so easily discounted. Although conceding that generally a disproportionately low price paid by the purchaser of stolen goods may support an inference of guilty knowledge, Calloway, 07-0012 at 9, 978 So.2d at 378 (citing State v. Chester, 97-1001, p. 3 (La.12/19/97), 707 So.2d 973, 974), the majority took into account that defendant was a self-described “unsophisticated buyer” who “had no driver’s license and had never owned or purchased a car before.” Calloway, 07-0012 at 10, 978 So.2d at 379. Thus, “as she testified at trial, she had no way of knowing the value of the vehicles she purchased.” Id. Given the circumstances under which defendant purchased the vehicles at a time when her neighborhood “was swiftly descending into total chaos around her and her family,” id., and under which she Rand her son then continued to use the vehicles openly in Houma without “attempting] to disguise or camouflage [them] in any way,” id., 07-0012 at 11, 978 So.2d at 380, the majority concluded that “any rational trier of fact, after viewing all of the evidence as favorably to the prosecution as possible, would have a reasonable doubt as to Ms. Calloway’s guilt.” Calloway, 07-0012 at 12, 978 So.2d at 380. In particular, “no rational trier of fact could have found that, under these circumstances, Ms. Calloway knew or had good reason to believe that the vehicles she purchased were stolen,” an essential element of the crime of possession of stolen things under La. R.S. 14:69. Id.
In dissenting from the decision to reverse defendant’s conviction and sentence, Judge Pettigrew observed that the majority had acted as a 13th juror in subscribing to a defense that had been presented to the jurors at trial and had been decisively rejected by them. Noting that the combined value of the vehicles when new was approximately $62,000, and that the insurance companies had paid out a total of approximately $49,000, Judge Pettigrew concluded that, notwithstanding defendant’s testimony “that there was some damage to the vehicles when she bought them and that this was the first time she ever purchased any vehicle, it was not unreasonable for the jurors to infer that [defendant] should have been put on notice about a seemingly illegitimate transaction wherein she acquired two relatively new vehicles for an extraordinarily low price.” Calloway, 07-0012 at 3, 978 So.2d at 382 (Pettigrew, J., dissenting). As for the circumstances surrounding the transaction, Judge Pettigrew observed that “given the widespread looting and stealing at this time, and the fact that Karen acquired these vehicles with a complete lack of transactional formality at the back of her neighborhood from someone with whom there was no discussion about where or how he came to |possess these vehicles, a reasonable juror could have inferred that Karen knew or had good reason to believe that the vehicles were stolen, and that she intended to possess stolen things given her two-month use and possession of these vehicles.” Id., 07-0012 at 3-4, 978 So.2d at 382-83 (Pettigrew, J., dissenting). Thus, Judge Pettigrew would have affirmed defendant’s conviction and sentence (which he specifically addressed and found not excessive) under the general principle of appellate review that “[w]hen a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant’s own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.” Id., 07-0012 at 4, 978 So.2d at 383 (Pettigrew, J., dissenting)(citing State v. Captville, 448 So.2d 676, 680 (La.1984)).
*422 After an independent review of the record, we fully subscribe to the views expressed by Judge Pettigrew. As the majority and dissent were fully aware, in State v. Chester this Court noted that the mere possession of stolen property does not give rise to a presumption that the person in possession of the property received it with knowledge that it was stolen from someone else and that the state “must therefore prove the defendant’s guilty knowledge as it must every other essential element of the offense.” Chester, 97-1001 at 2-3, 707 So.2d at 974. Nevertheless, we also recognized that jurors may infer guilty knowledge from the circumstance of the offense, i e., that defendant knew “or had good reason to believe ” that the goods in her possession had been stolen. La. R.S. 14:69(A)(em-phasis added). The statute permits a purely objective inquiry into the element of guilty knowledge. See La. R.S. 14:69 Rptr.’s Cmt. (“The element of knowledge of the offender that the goods were of the described nature when he | ^received them has given considerable difficulty. Must the offender subjectively know, or is he taken to know what any reasonable person so situated would have known? This section adopts a completely objective test here, because of the difficulty of proof by the prosecution.”). In this regard, we recognized in Chester that, as a matter of widespread jurisprudential authority, “one of the most telling indices of guilt is a low price paid by the receiver.” Chester, 97-1001 at 3, 707 So.2d at 974 (internal quotation marks and citation omitted). More generally, we have repeatedly cautioned that due process, rational fact finder test of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. See, e.g., State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983). A reviewing court may intrude on the plenary discretion of the fact finder “only to the extent necessary to guarantee the fundamental protection of due process of law.” State v. Mussall, 523 So.2d 1305, 1310 (La.l988)(footnote and citation omitted). Thus, as Judge Pettigrew emphasized, when a jury reasonably and rationally rejects the exculpatory hypothesis of innocence offered by a defendant’s own testimony, an appellate court’s task in reviewing the sufficiency of the evidence under the Due Process Clause is at an end unless an alternative hypothesis “is sufficiently reasonable that a rational juror could not ‘have found proof of guilt beyond a reasonable doubt.’ ” Captville, 448 So.2d at 680 (quoting Jackson, 443 U.S. at 324, 99 S.Ct. at 2792).
In the present case, the credibility of defendant’s testimony that she was an unsophisticated first-time car buyer who had no way of knowing the value of the vehicles she purchased, and who thus had no reason to believe that the vehicles InWere stolen from the disproportionately low price offered by Reggie or from the complete lack of documentation for the sale which had occurred in the context of the widespread looting following the storm, was a matter for the jury and not the court of appeal to assess under the totality of the circumstances surrounding her possession of the vehicles, including what her prior conviction for possession of stolen things said about her general credibility and level of sophistication. Defendant failed to convince the jury that she was so naive, and it was clearly not irrational for jurors to conclude, as a matter of logic and common experience, that defendant need not have purchased any vehicle before to have known generally that a 2003 *423 Toyota Tundra truck costs a substantial amount of money and far more than the amount accepted by Reggie. Even assuming that the Solara’s value had dropped precipitously because of water damage sustained in the aftermath of the storm, by defendant’s own account, Reggie had unexpectedly included the vehicle in the sale for nothing after she bid on the Tundra truck, which had sustained relatively little damage and whose power steering problems had been at least partially addressed by the dealership, as the truck was fully operational.
At any rate, as the state argued at the close of the case, jurors could assume that the immediate circumstances of the sale in the chaos following Katrina did not place a naive defendant subjectively on notice regarding the stolen character of the vehicles, and would not have alerted any reasonable person struggling under the pressure of the extraordinary circumstances following Hurricane Katrina and facing the need to evacuate her family from New Orleans, and yet still find defendant guilty as charged. Given all of the other circumstances surrounding the transaction, the failure of Reggie to make good on his promise to deliver the appropriate paper work for transferring title, registering the vehicle in defendant’s |12own name, and insuring it, and his subsequent disappearance when defendant returned to New Orleans to find him, gave jurors a rational basis for concluding that defendant had at the last, as would any other reasonable person, good reason to believe that she was in possession of, and had continued to use, property stolen in the widespread looting which had accompanied the aftermath of the storm and which she had personally experienced.
Accordingly, the decision of the court of appeal is reversed, defendant’s conviction and sentence are reinstated, and this case is remanded to the court of appeal for consideration of defendant’s remaining assignment of error, pretermitted on original appeal, with respect to her claim that her sentence is excessive.
DECISION OF COURT OF APPEAL REVERSED; DEFENDANT’S CONVICTION AND SENTENCE REINSTATED; CASE REMANDED.
CALOGERO, C.J., retired, dissents and assigns reasons.
JOHNSON, J., dissents and assigns reasons.

 Calogero, Chief Justice, retired, participated in the decision which was argued prior to his retirement.