STATE OF LOUISIANA,
v.
KAREN MARIE CALLOWAY.
No. 2007 KA 0012R.
Court of Appeals of Louisiana, First Circuit.
July 22, 2009.
Not Designated for Publication
JOSEPH WAITZ, Jr., District Attorney State of Louisiana, Houma, LA, Counsel for Appellee.
Mr. BARRY VICE, MS. ELLEN DAIGLE DOSKEY, Houma, LA, Assistant District Attorneys.
MS. GWENDOLYN BROWN, Louisiana Appellate Project, Karen Marie Calloway, Baton Rouge, LA, Counsel for Defendant/Appellant.
Before: PETTIGREW, DOWNING, and HUGHES, JJ.
HUGHES, J.
The state charged the defendant, Karen Marie Calloway, along with her son, Demond Calloway, with the illegal possession of stolen things having a value greater than $500.00, a violation of LSA-R.S. 14:69. They pled not guilty and, following a jury trial, Karen Marie Calloway was found guilty as charged, and Demond Kentrell Calloway was found not guilty. She was sentenced to three years imprisonment at hard labor. The defendant appealed, designating six assignments of error. In addressing the assignments of error regarding the sufficiency of the evidence, this court found no rational trier of fact could have found under the circumstances the defendant knew or had good reason to believe the vehicles she purchased were stolen and reversed the defendant's conviction and sentence. See State v. Calloway, XXXX-XXXX, p. 12 (La. App. 1st Cir. 11/7/07), 978 So.2d 374, 380. The state sought certiorari review. The Louisiana Supreme Court granted the state's application and found the majority on this panel erred by substituting their appreciation of the evidence and credibility of witnesses for that of the fact finder and overturning the verdict on the basis of a hypothesis of innocence presented to and rationally rejected by the jury. See State v. Calloway, 2007-2306, p. 1 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). The supreme court reversed the decision of this court, reinstated the defendant's conviction and sentence, and remanded the case to this court to consider the remaining assignments of error regarding excessive sentence, which were pretermitted on original appeal. See Calloway, 2007-2306 at p. 6, 1 So.3d at 423. In her fourth and fifth assignments of error, the defendant argued, respectively, that the trial court erred in imposing an excessive sentence, and that the trial court erred in denying the motion to reconsider sentence.

FACTS
When Hurricane Katrina struck the New Orleans area on August 29, 2005, Ms. Calloway, her boyfriend Travis Williams, her teenaged son Demond, her asthmatic ten-year-old daughter Kashawn, her seven months' pregnant "sister-in-law" Stephanie Williams, and a teenaged female neighbor named Keesa, were living in her apartment in Marrero. The group remained at the Marrero apartment for two days without electricity or a working phone, then decided to try and reach the Superdome to seek shelter when their supplies began running low, and looting and robberies were occurring in the neighborhood. They walked and hitched a ride to the Crescent City Connection bridge area, where the women stayed to rest while the men went to the Superdome. But the men were turned away by police at the Superdome and the family had to spend the night on the bridge. The men tried again the next day to reach the Superdome but were again turned away.
By that time, the family had run out of food and water and the situation on the bridge was deteriorating rapidly. They saw fighting, heard screaming, and learned that rapes and robberies were going on. Demond witnessed a stabbing over water that a man was saving for his infant. When a stranger tried to grab at Ms. Calloway's young daughter Kashawn, the family decided to return to their Marrero apartment.
When they returned home, their apartment had been broken into and their remaining food and water had been stolen. The door and windows had been kicked open and the family adults took turns during the night standing guard over the children. During the night, they heard screaming and gunshots around the area. There were no police. As the looting continued throughout the night in her neighborhood, Ms. Calloway began fearing for her and her family's safety since they had no food, electricity, water, or use of a phone. They had also heard that the nearby Harvey Canal might overflow.
The next day, a neighbor told Ms. Calloway that some men were at a location about half a mile away selling cars. Ms. Calloway and her son Demond walked over to look at the cars. They spoke to a man named "Reggie," who Ms. Calloway had heard around the neighborhood usually had cars to sell. Reggie had five or six vehicles and suggested that he would sell Ms. Calloway a Toyota Solara, but she wanted to purchase a Toyota Tundra pickup that Reggie had, thinking it would hold more people and belongings. Reggie was reluctant to sell the truck, indicating that he needed it, but the two continued negotiating. Ms. Calloway had to return home because her daughter had an asthma attack.
When Ms. Calloway returned to Reggie, she gave him $2,200.00,[1] for which she expected to buy the Tundra pickup. Instead, and to her surprise, Reggie gave her the keys to both the Tundra and the Solara. Reggie told Ms. Calloway that he did not have the sale documents available at that moment, but that he would either send the documents to the Houma address Ms. Calloway provided or bring them to her himself. Ms. Calloway later testified that at the time, she did not concern herself overly with the paperwork due to the chaos of the situation. Similarly, she did not suspect the vehicles were stolen because Reggie had the keys to both when he sold them to her and the vehicles did not look to have been broken into or hot-wired.
After acquiring the two vehicles, Ms. Calloway packed up her family and their belongings and they drove the Tundra and the Solara to Houma, where they stayed with Ms. Calloway's mother. About two months later, detectives from the Houma Police Department received a tip that led them to discover that the Solara and Tundra were stolen vehicles owned by Dr. Dimetry Cossich and Kevin Adams, respectively.
At the trial, Dr. Cossich, a dentist, testified that he purchased a new 2004 Solara for about $32,000.00 from Don Bohn Toyota on LaPalco Boulevard in Harvey. Before the hurricane hit, Dr. Cossich had brought the Solara to the dealership for a minor repair to a window. When the hurricane struck, Dr. Cossich evacuated, leaving the Solara at the dealership. Dr. Cossich testified that before the hurricane, the Solara was in excellent condition and had about 24,000 miles on it.
The facts concerning Mr. Adams's Toyota Tundra are similar. Mr. Adams testified that he purchased the 2003 Tundra new for about $30,000.00 from Bohn Brothers Toyota on LaPalco Boulevard in Harvey. Prior to the hurricane, Mr. Adams brought the Tundra to the dealership to have the power steering repaired. When the hurricane struck, Mr. Adams evacuated, leaving the Tundra at the dealership. He testified that before the hurricane, the Tundra was in excellent condition and had about 40,000 miles on it.
Both Dr. Cossich and Mr. Adams testified that they attempted to make a stolen vehicle report with Jefferson Parish authorities but were unable to do so. Dr. Cossich testified that the police advised him that they were not taking stolen car claims at that time.
Ms. Calloway testified that when she bought the Tundra pickup from Reggie, it was not severely damaged, but it was in only fair condition. She testified that the Solara had key marks on it, the sunroof was cut, there were dents in it, and the floor was wet. Travis Williams, Ms. Calloway's boyfriend, also testified that the vehicles were not in excellent condition. He reported that the Solara was "keyed up," the sunroof was cut open, the rearview mirror was broken off, and it had water damage to the interior. He testified that the Tundra had a flat tire and the stereo system had been ripped out, which left all the stereo wires hanging and exposed.
Ms. Calloway testified that while she did not purchase the vehicles from a known car lot, Reggie was known for selling vehicles in the back of the neighborhood.[2] She did not have a driver's license and prior to purchasing these two vehicles, she had never owned or purchased a car before. Thus, she testified, she had no way of knowing the retail value of the vehicles she purchased. She testified that it never crossed her mind that the vehicles were stolen. They did not look broken into or hot-wired and she thought that since the levee was getting ready to break, Reggie was trying to get rid of the cars "now and get something for it, or let the rain hit it and water take it away and get nothing for it."
In Houma, Ms. Calloway never altered or changed the Tundra's license plate or attempted to disguise or camouflage the vehicle in any way. Demond testified that he regularly drove the Solara to school and to work while in Houma after the hurricane. He testified that he had no idea the car was stolen. The price paid for the vehicles did not concern him and he did not discuss it with his mother. Ms. Calloway testified it was her understanding that Reggie was coming to Houma and would then give her the title to the vehicles. As it turned out, Reggie never did go to Houma and when Ms. Calloway went back to Marrero and looked for him, he was gone.
Jeff Walters, who qualified at the trial as an expert on appraising automobiles, testified on direct examination that a used 2004 Solara in excellent condition with 24,000 miles and features similar to those of Dr. Cossich's Solara would bring between $22,000.00 and $24,000.00 at an auction. If sold by a private individual, it would sell for between $24,000.00 and $27,000.00. Mr. Walters also testified that a 2003 Tundra, used but in excellent condition with 40,000 miles and features similar to those of Mr. Adams's Tundra, would have a wholesale value of $17,000.00 and a retail value as high as $20,500.00. On cross-examination, Mr. Walters testified that a $20,000.00 vehicle that was water-damaged would likely sell for "twenty-five cents on a dollar, at worst" or roughly $5,000.00. He was also asked on cross-examination: "[i]f, in fact, the vehicles were waterlogged, had some enginepower steering, the interior was trashed, maybe a little damaged, would it come a point where you would not pay a penny for those vehicles?" He responded, "In my current position, I would not."

ASSIGNMENTS OF ERROR NOS. 4 AND 5
The defendant's fourth and fifth assignments of error address the issue of excessive sentence. The defendant argues that the trial court erred in imposing an excessive sentence and denying the motion to reconsider sentence.
Article I, section 20, of the Louisiana Constitution prohibits the imposition of excessive punishment. Louisiana Code of Criminal Procedure article 894.1 sets forth the factors for the trial court to consider when imposing sentence. While the entire checklist of Article 894.1 need not be recited, the record must reflect the trial court adequately considered the criteria. Although a sentence falls within statutory limits, it may be excessive. State v. Sepulvado, 367 So.2d 762, 767 (La. 1979). A sentence is considered constitutionally excessive if it is grossly disproportionate to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks one's sense of justice. State v. Andrews, 94-0842, pp. 8-9 (La. App. 1st Cir. 5/5/95), 655 So.2d 448, 454. The trial court has great discretion in imposing a sentence within the statutory limits, and such a sentence will not be set aside as excessive in the absence of a manifest abuse of discretion. See State v. Holts, 525 So.2d 1241, 1245 (La. App. 1st Cir. 1988).
The articulation of the factual basis for a sentence is the goal of LSC.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with LSA-C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475, 478 (La. 1982). The trial judge should review the defendant's personal history, his prior criminal record, the seriousness of the offense, the likelihood that he will commit another crime, and his potential for rehabilitation through correctional services other than confinement. State v. Jones, 398 So.2d 1049, 1051-52 (La. 1981).
In the instant matter, the trial court imposed a three-year sentence at hard labor. While the trial court did not mention LSA-C.Cr.P. art. 894.1 by name, it is clear from its reasons for judgment at sentencing that it considered the article. At sentencing, the trial court stated in pertinent part:
[The defendant] does not have a significant record. She had a previous receiving stolen goods, but that was some time in the past.
The Court is familiar that she has a family. She was working at the time this happened, and what is particularly troublesome to the Court is that she has steadily and steadfastly maintained that she thought she owned these vehicles, which from this Court's standpoint is just ludicrous under the circumstances. If she had come to this Court and said, look, Judge, we were in a bad situation, we needed to get out of Marrero because of the circumstances that were there, you know, while legally it is not a justification but certainly a lot of things happened during Hurricane Katrina, which certainly law enforcement was not going to get involved in given the circumstances, and the Court could have understood certain things....
The story, in this case, is I bought two cars that are valued somewhere between 20- and $40,000. I have no papers, no title. I don't know who I bought them from. I didn't do a Bill of Sale. There was no notary, and I own two cars. And, simply, it does not wash under the circumstances of this matter.
The maximum sentence pursuant to LSA-R.S. 14:69(B)(1) is ten years imprisonment. The defendant had never owned or purchased a car and did not have a driver's license. There was no attempt to conceal the vehicles. The police reported complete cooperation. The defendant's actions were consistent with her story, which the trial court found "ludicrous." Others may disagree.
The defendant was sentenced to three years hard labor and denied an appeal bond despite its requirement under LSA-C.Cr.P. art. 332(C). Given the conviction mandated by the supreme court and its mention that the defendant has completed the sentence imposed and has been paroled, the issue is essentially moot. The time imposed was within the discretion of the trial court.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Testimony indicated that the Calloways had about $2,300.00 in cash at the time, most of which came from Ms. Calloway's husband's welding income.
[2] When asked on cross-examination if Reggie had a business office for the "car lot," the defendant responded, "[i]t was a house that had another little something going on in the shed, so I wouldn'tI didn't know what that part was."