CRAIN, J.
|aThe defendant, Ashley R. Heard, was convicted of second degree cruelty to a juvenile and second degree murder, and sentenced to concurrent terms of forty years and life imprisonment at hard labor. See La. R.S. 14:30.1; La. R.S. 14:93.2.3. She now appeals, arguing that there was insufficient evidence to prove the elements of second degree cruelty to a juvenile. We affirm the defendant’s convictions and sentences.
FACTS
Aaliyah Heard, the defendant’s eleven-month-old daughter, died on June 22, 2013. The previous day Baby Aaliyah was transported to the emergency room by ambulance in full cardiopulmonary arrest. After approximately thirty minutes of resuscitation, she regained a pulse but showed no evidence of clinical brain function. She was transferred to a pediatric intensive care unit on life support, where she was declared brain dead.
After an autopsy, Baby Aaliyah’s manner of death was ruled a homicide, with the cause of death listed as “[b]lunt force head and other injuries.” Baby Aaliyah had visible purplish-red bruising on her face and head, what appeared to be cigarette burns on her body, and a larger second-degree burn on her thigh. Her collar bone was *537 broken completely in two. Further analysis by a neuropathologist revealed severe swelling of Baby Aaliyah’s brain, bleeding on the surface of and around her brain, herniation of brain tissue, as well as blood clots around both optical nerves. The neu-ropathologist who consulted on the case concluded that Baby Aaliyah’s injuries were consistent with head trauma, such as shaken baby syndrome or blunt force trauma to the head.
The defendant was arrested and indicted for second degree cruelty to a juvenile that occurred from August 13, 2012, through June 20, 2013, and for |ssecond degree murder that occurred between June 21, 2013, and June 22, 2013.[1] Larry Leflore, identified by the defendant as Baby Aaliyah’s father, was also arrested in connection with Baby Aaliyah’s death, and was awaiting trial at the time of the defendant’s trial and conviction.
SUFFICIENCY OF THE EVIDENCE
A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const, amend. XIV; La. Const, art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, an appellate court must determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt based on the entirety of the evidence, both admissible and inadmissible, viewed in the light most favorable to the prosecution. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Oliphant, 13-2973 (La. 2/21/14), 133 So.3d 1255, 1258; see also La. Code Crim. Pro. art. 821B; State v. Mussall, 523 So.2d 1305, 1308-09 (La. 1988). When circumstantial evidence forms the basis of the conviction, the evidence, “assuming every fact to be proved that the evidence tends to prove ... must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438; Oliphant, 133 So.3d at 1258. The due process standard does not require the reviewing court to determine whether it believes the witnesses or whether it believes the evidence establishes guilt beyond a reasonable doubt. State v. Mire, 14-2295 (La. 1/27/16), — So.3d -, - (2016 WL 314814). Rather, appellate review is limited to determining whether the facts established by the direct evidence and inferred from the circumstances established by that evidence are sufficient for any rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Alexander, 14-1619 (La.App. 1 Cir. 9/18/15), 182 So.3d 126, 129, writ denied, 15-1912 (La. 1/25/16), 185 So.3d 748.
Second degree cruelty to a juvenile is “the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.” La. R.S. 14:93.2.3A(1). For purposes of that crime, “serious bodily injury” is “bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death.” La. R.S. 14:93.2.3A(2). Second degree murder is the killing of a human being while engaged in the perpetration or attempted perpetration of certain enumerated offenses, including cruelty to juveniles and second degree cruelty to juveniles. La. R.S. 14:30.1A(2). On appeal, the defendant explains that the state’s theory as to second degree murder was second degree cruelty to a juvenile. *538 The defendant contends that the evidence presented at trial was insufficient for any rational trier of fact to conclude beyond a reasonable doubt that she committed second degree cruelty to a juvenile.[2]
The extent of Baby Aaliyah’s injuries was detailed at trial. Dr. Melinda Frantz testified that she treated Baby Aaliyah in the pediatric intensive care unit. Dr. Frantz described bruising on Baby Aaliyah’s head and face, and particularly around her right eye. Based on the purplish-red color of the bruises, Dr. Frantz believed them to be only hours old. Baby Aaliyah had a second degree burn that measured approximately three centimeters in diameter on her right thigh, which Dr. Frantz estimated to be two-to-three days old. Dr. Frantz also noted a smaller burn on Baby Aaliyah’s thigh that she believed to be older, as well as what | ^appeared to be cigarette burns on Baby Aaliyah’s right ankle and scattered bruising on Baby Aaliyah’s body. Baby Aaliyah’s collar bone was also fractured.
Dr. Cameron Snider, a forensic pathologist, conducted the autopsy. He testified that he observed several slightly purple colored bruises on the right side of Baby Aaliyah’s forehead and down her right cheek. There were also several bruises on the left side of the Baby Aaliyah’s face and across her forehead. Dr. Snider testified that he noted multiple welted areas on Baby Aaliyah’s cheeks with intervening pale spots, which he recognized as being consistent with a hand slap. The autopsy revealed that the facial bruising was “severe” as the underlying tissue showed hemorrhaging from the skin surface all the way to the bone, which Dr. Snider explained, could only have been caused by significant force. In his expert opinion, Dr. Snider believed that Baby Aaliyah was struck multiple times, and that Baby Aaliyah’s manner of death was homicide by blunt force head trauma and other injuries.
In addition to the bruising on Baby Aaliyah’s face and head, Dr. Snider described three scabs on the front and side of Baby Aaliyah’s upper left arm. She also had a scab below her hip that was in the process of scarring and slightly retracted scabs on her left and right feet. He testified that she had a larger lesion on her leg where the skin’s surface had burned away. Dr. Snider believed that the scabs on Baby Aaliyah’s left forearm, right foot, and the side of her thigh were consistent with cigarette burns. The shape of the larger leg burn indicated to him that a hot object had contacted Baby Aaliyah’s skin.
Dr. Snider found that Baby Aaliyah’s clavicle had been snapped completely in two. Based on his examination, he believed that injury was less than twenty-four hours old. Dr. Snider explained that that type of injury was caused from a significant fall or a forcefully inflicted injury, such as the baby being pushed down. | fiDr. Snider also observed some older injuries, including bruising to Baby Aaliyah’s ribs.[3]
Dr. Zhenggang Xiong, a neuropathologist, consulted with the coroner’s office on the case. Dr. Xiong testified that he examined Baby Aaliyah’s brain and found a blood clot underneath the dura membrane and bruising on the surface of the brain. *539 He also observed fourteen milliliters of blood in the subdural space between the dura and brain, which he explained was a significant amount for that small space. Based on his analysis of the blood cells, he characterized the bleeding as only a few days old. Additionally, Dr. Xiong observed severe swelling of the brain tissue as well as a herniation of a piece of tissue from the brain. Dr. Xiong testified that compression of the brain stem by the herniated tissue would cause the entire body to stop functioning, resulting in death. When he examined Baby Aaliyah’s eyes, Dr. Xiong found blood clots around both optical nerves. He concluded that the pathological changes in Baby Aaliyah’s brain and eyes were consistent with head trauma that was recent (within a few days), and that the damage happened less than one week prior. He did not see any evidence of older brain trauma or hemorrhage. In his expert opinion, Dr. Xiong believed that the injuries were consistent with shaken baby syndrome or some other head trauma, such as blunt force trauma to the head.
The defendant argues on appeal that there is no evidence that she harmed Baby Aaliyah. She further contends that that the recent nature of Baby Aaliyah’s injuries proves that they occurred shortly before Baby Aaliyah became unresponsive. The defendant argues that there is evidence that Leflore visited and abused Baby Aaliyah on the morning that she was transported to the emergency 17room.[4] The defendant contends that she is a good mother and that when she found Baby Aaliyah unresponsive, she immediately began CPR, contacted 911, and sought emergency treatment. The defendant claims there is no evidence that she had any prior knowledge that Leflore was abusive toward Baby Aaliyah before that morning, or that she knew or should have known that Baby Aaliyah needed protection.
The defendant’s own statements contradict her assertion that she had no knowledge that Baby Aaliyah was being abused. She was interviewed by both police detectives and child protection investigators on June 21, 2013, the day Baby Aaliyah was taken to the emergency room. She explained to the detectives that Baby Aaliyah played normally the day before, but threw up a bottle, and that she intended to take the baby to the doctor because of some prior reflux issues. Baby Aaliyah slept through the night and woke around 7:30 a.m. The defendant stated that Baby Aaliyah would only eat a few bites of her breakfast, then took a bottle and fell asleep watching television in bed with the defendant. Between 10:30 and 11:00 that morning, the defendant put Baby Aaliyah in a walker. The defendant explained that by that time Leflore was there and they all watched television in the living room. When she again tried to feed the baby, Baby Aaliyah would only eat one bite of food, and then began nodding her head. The defendant then put Baby Aaliyah to bed and went to her own bedroom. Leflore then alerted the defendant that Baby Aaliyah was “foaming by the mouth.” The defendant claimed she began chest compressions and that “more was coming out.” While Leflore continued caring for Baby Aaliyah, the defendant went to ask a neighbor to call 911, and when the neighbor did not answer, she went outside and asked someone sitting in a car to make the call. The defendant stated that by that time Leflore told her he |8would drive them, so they proceeded toward the hospi *540 tal and flagged down the approaching emergency vehicle on their way.
The defendant explained that Leflore did not live at her home, but was “in and out,” visiting and playing with Baby Aaliyah, sometimes staying thirty minutes to an hour. She admitted that the previous weekend she had walked in on Leflore “popping” Baby Aaliyah “hard” on the leg. The defendant also stated that Leflore would hit Baby Aaliyah if she would not eat something that he was attempting to feed her. In the interview the defendant denied burning Baby Aaliyah herself. She further denied smoking cigarettes, although a search of her apartment that day revealed cigarette butts and ashes on the window ledges in the living room, her bedroom, and the master bathroom.
The defendant maintained that the large burn on Baby Aaliyah’s leg was a carpet burn caused by Baby Aaliyah crawling. The defendant stated that she noticed it the previous weekend and took the baby to the doctor on Tuesday. When asked why a social worker who visited earlier that week said that she did not notice any injuries, the defendant claimed that the baby was wearing a dress that covered the burn, not a t-shirt and diaper as the social worker had stated. The defendant also explained that when she first noticed the bum it was smaller, but that it grew larger after the baby’s bath when the area was rubbed with a towel, first claiming that she bathed the baby, then later claiming that it was Leflore.
The defendant claimed that she asked Leflore about a “blister” on the baby but he did not know what she was talking about. The defendant indicated that she was scared of Leflore, so after he left her apartment she asked her six-year-old son about what transpired when he was in the same room as Leflore and Baby Aaliyah. According to the defendant, her son told her that Leflore hit Baby Aaliyah’s thigh with a belt and had a cigarette near Baby Aaliyah’s foot.
|gThe defendant also told child protection investigators that Leflore found Baby Aaliyah foaming at the mouth. When asked about the baby’s physical injuries, the defendant again described the burn on Baby Aaliyah’s leg as a carpet burn, and claimed that she had sought medical treatment. The defendant offered no explanation for Baby Aaliyah’s other injuries, other than to speculate that they may have been caused by her six-year-old son, with whom Baby Aaliyah shared a room. The investigator testified that she interviewed the defendant’s son the following day and he stated that he saw “milk” coming out of Baby Aaliyah’s mouth, but he denied hurting his sister or seeing anyone else hurt her.
Later, in a June 24, 2018 interview with the police, the defendant claimed that she never actually saw Leflore hit Baby Aaliyah, but said that her son told her that Leflore had “popped” the baby. The defendant admitted that she had seen some bruising and some type of burns on Baby Aaliyah and that she thought that the burns may have been inflicted by Leflore. The defendant told the police that she attempted to question Leflore when she noticed burn marks on Baby Aaliyah, but Leflore “had an attitude” when she asked what happened. She admitted that she had seen marks on Baby Aaliyah’s forearm and thigh, and had even questioned smokers who had been around the baby. The defendant claimed that after she saw the burns, she quit her job to care for Baby Aaliyah herself; however, she acknowledged seeing new burns on the baby’s feet thereafter. The defendant denied burning the baby and denied smoking cigarettes, although she admitted to smoking “weed.” She claimed that the only other adults who *541 had been in her apartment were her brother and Leflore.
In the June 24, 2013 interview, the defendant suddenly remembered and described an incident wherein Leflore forced Baby Aaliyah to sit down by pushing the baby’s right shoulder. However, she claimed that Baby Aaliyah did not cry thereafter when the defendant held her. The defendant then asserted that Baby | inAaliyah’s face had been bruised when she fell to the floor from a bottom bunk bed on June 11, 2013. The defendant admitted that she noticed purplish bruises on Baby Aaliyah’s face on Monday, June 17, 2013, and explained that someone had been kissing the baby’s face, then related that her son told her that Leflore had pressed the baby’s head into a pillow with his hand. The defendant claimed that she brought the baby to the doctor the following day, but the baby’s face was no longer discolored and the doctor did not notice the bruising. She claimed she did not call police because she feared for her life. The defendant also told the police that Leflore beat her up and “poked” her with a knife oh Wednesday, June 19, 2013, stopping only when her brother entered the apartment.
On September 5, 2013, the defendant, who was not yet in police custody, contacted the assistant district attorney’s office. During the course of the recorded telephone call, the defendant described walking in on Leflore “popping” Baby Aaliyah’s knee and her son telling her that Leflore was angry because the baby would not eat. The defendant also claimed that she brought Baby Aaliyah to Dr. Robert Feld-man for treatment of the burn on her leg either the Thursday or Saturday prior to her death and was prescribed cream to treat the burn. The defendant claimed that the burn was smaller, but grew larger as she applied the cream. When asked about the other burns on Baby Aaliyah’s body, the defendant speculated that they were not burns, but bumps similar to those her other son had, which were caused by a fungus like ringworm. The defendant also stated that her brother and Leflore smoked in her home, and that she smoked marijuana, but never cigarettes.
On September 11, 2013, the defendant was again interviewed by police and claimed that she never left Baby Aaliyah alone with Leflore except when she walked out to her mailbox. She claimed that her son told her that Baby Aaliyah sustained the large burn on her leg when playing on the carpet with him and their Inother brother. The defendant again claimed that she took Baby Aaliyah to the doctor for the burn and was given a cream or salve for it. The defendant also again claimed that the marks on Baby Aaliyah’s arm were caused by a fungus contracted from the defendant’s other child.
During the September 11, 2013 interview, after detectives informed the defendant that she had been indicted for second degree murder, she admitted that she heard Leflore slap Baby Aaliyah on Wednesday, June 19, 2013, but did not see the abuse taking place. She claimed that it occurred after Leflore beat her. She also admitted that she saw the burn on Baby Aaliyah’s leg a week prior, but that it was much smaller. She claimed that the burn mark got larger after Leflore bathed the baby.
On September 12, 2013, at her request, the defendant, who was then in police custody, again met with detectiyes. She told them that everything she stated before was a lie and that- she wanted to tell the truth because she did not want to stay in jail for a crime she did not commit. The defendant said that she and Leflore argued and engaged in a physical altercation on Wednesday, June 19, 2013. She claimed *542 that her son told her that Leflore then hit Baby Aaliyah’s legs to force her to lie down. The defendant also stated that Baby Aaliyah cried every time Leflore came to the apartment, which made Leflore angry. The defendant stated that she once left Leflore alone with Baby Aaliyah while checking the mailbox, and admitted that she noticed fresh burns on the baby’s feet when she returned.
The defendant told the detectives that she noticed bruises on Baby Aaliyah’s face on Thursday, June 20, 2013. She stated that both sides of Baby Aaliyah’s mouth were a “pinkish purple” color, and that she asked Leflore about the bruising because she noticed the way he was holding the baby’s mouth while feeding her. According to the defendant, Leflore attributed the redness of the baby’s face to | ^kissing her. She told detectives that her son told her that Leflore hit Baby Aaliyah, who fell down and hit her face on the floor.
Describing the morning that Baby Aaliyah went to the emergency room, the defendant said that she noticed that the baby could not hold her head up and did not want to eat. The defendant believed the baby was tired. According to the defendant, Baby Aaliyah fell asleep on her lap as she sat in the living room with her six-year-old son and Leflore. The defendant stated that Leflore took Baby Aaliyah to her room and, five to seven minutes later, Leflore went back into the baby’s room and called out to the defendant because he noticed Baby Aaliyah was foaming at the mouth. The defendant then began performing chest compressions on the baby, and after the foaming stopped, began CPR. The defendant claimed that as she and Leflore drove to the emergency room following the ambulance transporting Baby Aaliyah, Leflore told her to tell detectives that she was the one who walked in and discovered Baby Aaliyah foaming at the mouth. She also stated that the defendant told her to say that he never touched or bathed Baby Aaliyah. The defendant claimed that she did not come forward with the information sooner because she was scared.
Department of Children and Family Services Child Welfare Specialist, Terrilyn Harx-is, testified that she spoke with the defendant’s six-year-old son on June 24, 2013. The defendant’s son told Harris that Leflore was “mean” to Baby Aaliyah. The defendant’s son told her that Leflore attempted to feed Baby Aaliyah grits on the morning she went to the emergency room, and became upset when she did not want to eat. According to the defendant’s son, Leflore forced Baby Aaliyah to take a bite of the grits, then whipped her lap and face, which he demonstrated by rapidly hitting his own cheeks. In her September 12, 2013 interview, the defendant admitted that her son’s statement was true.
| iaThe defendant’s son testified at trial. He was then eight years old and living with foster parents. According to his testimony, Leflore “kept on whooping [Baby Aaliyah] and every time he [came] around, she started crying.” He testified that Le-flore used a slipper and a belt to whip Baby Aaliyah. He denied seeing Leflore whip Baby Aaliyah on the morning she went to the emergency room. He stated that he saw milk come out of Baby Aaliyah’s nose and that Leflore’s eyes were “mean” and “angry” that day. He further testified that he was scared of Leflore and that Leflore had started fights with the defendant at the defendant’s apartment. He stated that he also heard Leflore hit the defendant.
Contrary to the defendant’s assertion that she brought Baby Aaliyah to Dr. Feldman the Thursday or Saturday prior to her death, Dr. Feldman testified that his last visit with her was on February 20, 2013. Dr. Feldman also testified that he did not see the burn to Baby Aaliyah’s *543 thigh, but the photograph of it did not look like carpet burn. Similarly, Dr. Frantz testified that the burn could not have been caused by carpet burn and that if the baby came into her office with these injuries, she would have reported it to family services.
When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Moten, 510 So.2d 55, 61 (La. App. 1 Cir.), writ denied, 514 So.2d 126 (La. 1987). No such hypothesis exists in the instant case. The defendant’s own statements establish that she was aware that Baby Aaliyah was being abused prior to the morning that she was taken to the hospital, and that she took no action to protect Baby Aaliyah. An appellate court errs by substituting its appreciation of the evidence and credibility of the witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the trier of fact. See State v. Calloway, 07-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). The jury heard, and rejected, the defendant’s theory that she was unaware of the abuse inflicted upon Baby Aaliyah by Leflore. Viewing the evidence in the light most favorable to the state, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of second degree cruelty to a juvenile and second degree murder,
CONVICTIONS AND SENTENCES AFFIRMED.

. The state amended the bill of indictment to change the starting date of the second degree cruelty to a juvenile offense from July 27, 2012, to August 13, 2012.

. The defendant does not dispute that, at the relevant times, she was over the age of seventeen and that Baby Aaliyah was under the age of seventeen.

. Dr. Frantz testified that her examination of Baby Aaliyah revealed dilation of the rectum and three lacerations, which indicated penetrating trauma. Dr. Snider, however, testified that the rectum was normal, and that he noted scrapes around the anus, but no tearing or abnormal dilation. During police interviews the defendant denied any knowledge of sexual abuse.

. The evidence indicates that the defendant and Leflore were involved in a relationship, but he did not live with the defendant and her children (Baby Aaliyah, who she contends Le-flore fathered, and two boys ages three and six).