NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

* * * * * * *

2019 KA 0110

STATE OF LOUISIANA

VERSUS

STEVEN STAGGS

JUDGMENT RENDERED: **SEP 2 7 2019**

* * * * * * *

Appealed from the
Nineteenth Judicial District Court
In and for the Parish of East Baton Rouge • State of Louisiana
Docket Number 10-09-0936 • Section III

The Honorable Michael R. Erwin, Judge Presiding

* * * * * * *

Prentice L. White
*Louisiana Appellate Project*
Baton Rouge, Louisiana

ATTORNEY FOR APPELLANT
DEFENDANT—Steven Staggs


Hillar C. Moore, III
*District Attorney*

ATTORNEYS FOR APPELLEES
The State of Louisiana

Dylan C. Alge
*Assistant District Attorney*
Baton Rouge, Louisiana


* * * * * * *

BEFORE: McCLENDON, WELCH, AND HOLDRIDGE, JJ.

**WELCH, J.**

The defendant, Steven Staggs, was charged by bill of information with second degree cruelty to juveniles, a violation of La. R.S. 14:93.2.3. He pled not guilty and, following a jury trial, was found guilty as charged. The defendant was sentenced to forty years imprisonment at hard labor. The defendant now appeals, designating two assignments of error. We affirm the conviction and sentence.

## FACTS

The defendant and his wife, Amanda, had a son, E.S.[1] In 2008, Amanda died, and the defendant married Charlotte, now E.S.'s stepmother. Charlotte had a son from a previous relationship, and the defendant and Charlotte had a daughter. On August 23, 2009, twenty-month old E.S. was at home with the defendant in Baton Rouge. E.S. ingested fingernail polish remover (acetone) and became ill. E.S. was taken by ambulance to Our Lady of the Lake Regional Medical Center, where he was initially treated in the emergency room by Dr. Ashley Saucier, Medical Director of the Pediatric Emergency Department.

Dr. Saucier testified at trial that when E.S. arrived, he was unconscious and having difficulty breathing. His jaw was clenched, which indicated a lack of oxygen to the brain. He was given medicine to relax his jaw, so that a breathing tube could be inserted. Once E.S. was stabilized, Dr. Saucier indicated that she was shocked when she learned that E.S. was twenty-months old because he was undersized. According to Dr. Saucier, E.S. was very underweight and his ribs were showing. E.S. weighed fifteen pounds. The doctor also observed bruises all over E.S.'s body, as well as sores over his nose and lips.

Dr. Saucier further testified that the toxicology results of E.S. revealed acetone and isopropyl alcohol. The doctor indicated that upon admission, E.S. was having renal insufficiency and his creatinine level was much more elevated than it

---

[1] The victim is referred to by his initials. See La. R.S. 46:1844(W).

2

should have been for a child his age. His blood level was also acidotic, which meant he had an elevated amount of acid in his blood. Dr. Saucier indicated that these symptoms would not have been caused by ingestion of fingernail polish remover, but rather from severe dehydration, which was improved with I.V. fluids. Dr. Saucier noted that E.S. did not have diabetes. She also testified that if E.S. had continued in the physical state he was in, within two months he would not have survived.

E.S. was moved to the pediatric intensive care unit (PICU), where he remained for five or six days. Kristi Rabalais, a PICU nurse practitioner who treated E.S. and had worked in critical care for more than ten years, testified that E.S.'s "injuries were pretty severe and he survived them and he was one of the worst I've seen that lived."

Dr. Saucier testified that when the defendant was asked about the bruising on E.S., the defendant indicated E.S. had fallen down stairs the day before. When asked about older bruising, medical staff was informed that E.S. liked to throw himself off of furniture. The hospital contacted the Department of Children and Family Services based on Dr. Saucier's findings of bruising in various stages of healing, burn marks on the child's body, and the child's extreme small size. When asked if all of this pointed to abuse and neglect, Dr. Saucier testified:

> It's at the top of our differential at that point. So we have -- a differential diagnosis is like a list of things we include, what could be wrong with him. So for [E.S.] the list was ingestion -- we knew he had ingested something -- respiratory failure, dehydration, renal insufficiency, and then in his case, non-accidental trauma as well.

The defendant testified at trial. According to the defendant, he never abused E.S., and he never helped Charlotte abuse E.S.

## ASSIGNMENT OF ERROR NO. 1

In his first assignment of error, the defendant argues the evidence was insufficient to support the conviction. Specifically, the defendant contends that he

had no knowledge of the treatment E.S. was receiving at home from Charlotte, E.S.'s stepmother, while he was working long hours.

A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See La. Code Crim. P. art. 821(B); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; **State v. Mussall**, 523 So.2d 1305, 1308-09 (La. 1988). The **Jackson** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See **State v. Patorno**, 2001-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144.

La. R.S. 14:93.2.3 provides, in pertinent part:

> A. (1) Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.
>
> (2) For purposes of this Section, "serious bodily injury" means bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death.

"Intentional" as used in the statute refers to general criminal intent, present whenever there is specific intent, and also when circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. See La. R.S. 14:10(2); **State v. Cooper**, 2015-0820 (La. App. 4th

4

Cir. 9/13/17), __ So.3d __, 2017 WL 4052026, writ denied, 2017-1561 (La. 11/28/17), 230 So.3d 222. "Mistreatment" as used in the statute is equated with abuse. **State v. Booker,** 2002-1269 (La. App. 1st Cir. 2/14/03), 839 So.2d 455, 459, writ denied, 2003-1145 (La. 10/31/03), 857 So.2d 476. Criminally negligent mistreatment or neglect of the juvenile exists when, although neither specific nor general intent is present, there is such disregard of the interest of the juvenile that the defendant's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances. See La. R.S. 14:12; **State v. Henderson,** 2013-0074 (La. App. 1st Cir. 9/13/13), 135 So.3d 36, 48, writ denied, 2013-2327 (La. 3/21/14), 135 So.3d 617.

The defendant asserts in brief there was no direct evidence linking him to E.S.'s physical condition. According to the defendant, he was "not seen" abusing or acquiescing in the abuse of his son. The defendant suggests his wife, Charlotte (E.S.'s stepmother) could have been the culprit who carefully hid E.S.'s abused body, knowing that he "was too tired, and too overworked to notice." According to the defendant, the evidence failed to establish that he "harbored" the necessary criminal intent to harm or neglect his son.

E.S.'s deteriorated physical condition at the hospital was readily apparent to anyone who observed him. He was twenty months old and weighed only fifteen pounds. He had sores on his nose, lips, and face. He had cuts and bruises on his arms and legs. He had burn marks on both the front and back of his right leg. Some of the bruises and sores appeared fresh, while others were older. The burn mark on the front of his thigh had the impression of fork tines. Dr. Saucier testified that it was an old burn mark, and that the burning did not happen accidentally. E.S. was diagnosed by Dr. Saucier with "failure to thrive." Dr. Saucier explained that such a diagnosis meant that E.S. had dropped off of the growth curve. According to Dr. Saucier, as long as a child followed the growth

5

curve of at least the fifth percentile, in terms of weight plotted against age, then "it's not a problem." Dr. Saucier continued: "When they, what we call fall off of the growth curve, when they completely lose that curve, that's when it becomes a problem. And [E.S.] on his admission was far, far, far below the growth curve for his age. So he was very underweight."

The foregoing, thus, clearly indicates the physical abuse of E.S. occurred over a period of time. It is suggested in brief that the defendant did not notice the various marks and sores on E.S.'s body because he was too tired and too overworked. The defendant's own testimony, however, indicated otherwise. He had been working for about nine years for A.E.P., a tugboat company, when he and Charlotte and their children lived in Baton Rouge. In 2009, the defendant worked twelve-hour shifts, then returned home every night. On cross-examination, the defendant revealed that when he did see bruises on E.S., he would question Charlotte about them, and she would always tell him (the defendant) the bruises were from E.S. playing "rough" with their other child, or from E.S. tripping and falling on a toy. According to the defendant, regarding Charlotte's explanations about the bruises on E.S., "I trusted her whatever she was giving me."

Lindsey Leavoy, a Baton Rouge attorney who handled a civil matter for E.S.'s maternal grandmother, testified at trial that she took the defendant's deposition in June of 2009.[2] According to Leavoy, when asked about his employment, the defendant indicated he came home either every night or every day. The defendant explained: "I have a rotating shift, kind of like plant work. You have seven days work, seven nights you work and then you're off for seven days." Accordingly, any rational juror could have concluded that the defendant was aware of the various injuries E.S. had on his body, as well as E.S.'s

_____

[2] After Amanda died in an accident, Amanda's mother obtained a settlement in a case on behalf of E.S. in the amount of $225,000. This money was placed into an annuity, which would become available to E.S. when he turned eighteen years old. There was also evidence that the defendant would have received the $225,000 in the event of the death of E.S.

malnourished state.

The defendant suggests in brief that Charlotte was responsible for all of E.S.'s injuries. Upon being reminded of the pictures taken of E.S. at the hospital, the defendant indicated at trial that he had seen the pictures before, and that he did not do that to E.S. nor help Charlotte do that to E.S. But even if, as suggested, Charlotte inflicted most or all of the abuse, the defendant's failure to protect his son from these attacks, amounted to criminally negligent neglect in accordance with La. R.S. 14:93.2.3. See **State v. Heard**, 2016-0809 (La. App. 1st Cir. 12/2/16), 208 So.3d 535, 543, writ denied, 2017-0293 (La. 11/13/17), 229 So.3d 926 (finding the defendant guilty of second degree cruelty to a juvenile, wherein her own statements established she was aware that her baby was being abused prior to the morning that she was taken to the hospital and that she took no action to protect her baby).

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. **State v. Taylor**, 97-2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. See **State v. Mitchell**, 99-3342 (La. 10/17/00), 772 So.2d 78, 83. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. **State v. Quinn**, 479 So.2d 592, 596 (La. App. 1st Cir. 1985). See **State v. Weary**, 2003-3067 (La. 4/24/06), 931 So.2d 297, 311-12, cert. denied, 549 U.S. 1062, 127 S.Ct.

682, 166 L.Ed.2d 531 (2006).

When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. **State v. Captville**, 448 So.2d 676, 680 (La. 1984). In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. **State v. Higgins**, 2003-1980 (La. 4/1/05), 898 So.2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).

An appellate court errs by substituting its appreciation of the evidence and credibility of the witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the trier of fact. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). The jury heard, and rejected, the defendant's theory that he was unaware of the abuse inflicted upon E.S. and/or that the abuse was inflicted by someone other than him. See **Captville**, 448 So.2d at 680; **Heard**, 208 So.3d at 543.

After a thorough review of the record, we find the evidence supports the jury's verdict. We are convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of second degree cruelty to juveniles. See **Calloway**, 1 So.3d at 418.

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

In his second assignment of error, the defendant argues that his sentence is

8

excessive.

A thorough review of the record indicates the defendant did not make or file a motion to reconsider sentence based on any specific ground following the trial court's imposition of the sentence. Under La. Code Crim. P. arts. 881.1(E) and 881.2(A)(1), the failure to make or file a motion to reconsider sentence shall preclude the defendant from raising an objection to the sentence on appeal, including a claim of excessiveness. See **State v. Mims**, 619 So.2d 1059 (La. 1993) (per curiam). The defendant, therefore, is procedurally barred from having this assignment of error reviewed because of his failure to file a motion to reconsider sentence after being sentenced. See **State v. Duncan**, 94-1563 (La. App. 1st Cir. 12/15/95), 667 So.2d 1141, 1143 (*en banc per curiam*).

This assignment of error is without merit.

For the foregoing reasons, the defendant's conviction and sentence are affirmed.